2016 IL App (1st) 150956
No. 1-15-0956
Opinion filed January 20, 2016

THIRD Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* JORDYN L., a Minor, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Respondent-Appellee | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | No. 14 JA 150 |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | The Honorable |
| v. | ) | John Huff, |
| | ) | Judge Presiding. |
| Paris L., | ) | |
| | ) | |
| Respondent-Appellant). | ) | |

_____

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1     Mother/respondent-appellant Paris L. (respondent) appeals from an order entered by the trial court finding that her daughter, Jordyn L., was neglected and abused. She contends that the trial court erred in its determination because the evidence presented was insufficient to support its finding. She asks that we reverse the trial court's determination of neglect and abuse and dismiss the remainder of the cause. The State and the minor's public guardian have filed appellees' briefs. For the following reasons, we affirm.

¶ 2                                          BACKGROUND

¶ 3          Jordyn was born to respondent on October 11, 2013.  At that time, and at the time of the

hearings relevant to this appeal, respondent herself was a ward of the juvenile court, having

been placed under the guardianship of the Department of Children and Family Services

(DCFS) in 2007 at the age of 12, as she was removed from the custody of her mother

Charletta L. and later from the guardianship of her grandmother, Antoinette L.

¶ 4          On February 14, 2014, the State filed a petition for adjudication of wardship for Jordyn,

alleging neglect based on injurious environment and abuse based on substantial risk of

physical injury.  As the basis for the petition, the State alleged that respondent was not in

compliance with assigned services, including parent coaching, mental health services,

psychological evaluation and individual therapy.  The petition also noted that respondent had

been previously diagnosed with intermittent explosive disorder, reactive attachment disorder,

post-traumatic disorder and attention deficit hyperactivity disorder (ADHD); that she has a

history of psychiatric hospitalizations due to aggression and elopement behaviors; that she

refuses to disclose Jordyn's whereabouts and creates inappropriate care plans for her; that she

is often observed to be aggressive and threatening towards others; and that she has made

conflicting statements as to the putative father's identity and whereabouts.

¶ 5          At the adjudication hearing, the State began by introducing several exhibits, particularly

adjudication and disposition orders for respondent's several siblings.  Those regarding Jamie

T., dated 2001, found neglect based on injurious environment and abuse based on substantial

risk of physical injury, naming mother Charletta as unable and unwilling to care for the child.

Those regarding Ebony I., dated 2007, found abuse and neglect based on lack of care,

injurious environment and substantial risk of physical injury as she was left with a caregiver

who whipped a sibling with an extension cord and because another minor was found to have multiple fractures consistent with abuse. Those regarding Jamaael L., also dated 2007, found neglect based on lack of care and injurious environment due to marks on his back caused by a belt and extension cord, as well as because another minor was found to have multiple fractures consistent with abuse. Both Ebony and Jamaael's orders named mother Charletta and guardian Antoinette. Those regarding another sibling, Cody L., dated 2011, found neglect based on lack of care, injurious environment, physical abuse and abuse based on substantial risk of physical injury, with an added finding of sustained abuse, again naming mother Charletta as unable to care for him. Further, the trial court took judicial notice of respondent's own adjudication and disposition orders, dated 2007–the same dates as Ebony and Jamaael's orders. The State also submitted respondent's medical records from Hartgrove, Riveredge and Streamwood hospitals.

¶ 6 Heather Blankenship, respondent's case manager from the agency UCAN from July 16, 2013 to January 15, 2014, testified that she first met respondent when she was pregnant with Jordyn and had just moved into UCAN's living program at its Cermak site. Blankenship immediately referred respondent for parenting and counseling services, assigned her a counselor and a doula, and referred her to the site's psychologist for a psychological evaluation. Blankenship recounted that on October 28, 2013, she met with respondent, who now had Jordyn with her. Respondent told her she felt as if she were suffering from postpartum depression. Blankenship explained to respondent the seriousness of this and told her she needed to meet with her counselor, and also encouraged her to meet with the site's psychologist. In addition, Blankenship spoke to respondent again about submitting to a psychological evaluation, as respondent had been involved in several physical altercations

with other residents at the site, sometimes when Jordyn was present. Blankenship followed up by informing respondent's counselor about her depression concerns. She later discovered that respondent never met with the psychologist, as suggested, and had not been meeting consistently with her parenting coach or her therapist. Respondent refused to agree to a referral for the psychological evaluation.

¶ 7       Blankenship further testified that, at the October 28, 2013 meeting with respondent, her supervisor told respondent that because she was "out of placement," *i.e.*, away from the UCAN site, so often, and because of concerns for Jordyn, respondent would need to be in placement at the UCAN site every 24 hours. As Blankenship explained, this resulted from respondent's pattern of leaving the site with Jordyn for approximately three days, returning without Jordyn for a night, and refusing to tell site personnel where the child was. Blankenship stated that, apart from respondent's explanation that she was going to the home of Jordyn's father and her refusal to provide personnel with his full name or address, she did not know where respondent was going or where she was leaving Jordyn. When respondent was told she would have to be in placement every 24 hours, she became very upset and disrespectful; Blankenship's supervisor told her she would have to leave, which respondent did, in a very loud and disrespectful manner.

¶ 8       Blankenship averred that, because of the altercations with other residents, it was decided that respondent should be moved from UCAN's Cermak site to its Clyde site, where the number of altercations involving respondent lessened. However, in describing respondent's move in November 2013, Blankenship recounted that she was charged with helping respondent transport her belongings. Blankenship arrived with a moving van, but respondent did not want her there. Blankenship's supervisor told her to move respondent regardless of

her resistence, so Blankenship began packing respondent's belongings and loading them into the van. During this time, respondent made threatening comments about Blankenship to her roommate and repeatedly told Blankenship not to touch her things. Once the van was packed, respondent got into one of the back rows of seats with Jordyn and was very disrespectful and verbally threatening to Blankenship, for example, telling her that she was going to "come up there to the front seat" if Blankenship did not adjust the music as she wished. Blankenship warned she would have to call the police if she did, and she stopped talking to respondent during the remainder of the drive. Then, upon arriving at the Clyde site, respondent refused to get out of the van, so Blankenship and another staff member began unloading her belongings. At this point, respondent, who had brought Jordyn inside to the site staff, became upset and disrespectful, cursing loudly at Blankenship on the street and threatening physical violence, whereupon police were called.

¶ 9        Blankenship further testified that, based on this incident, her supervisor felt it was unsafe for her to remain on respondent's case and officially reassigned the case on January 15, 2014. On that date, Blankenship met with respondent to introduce her to her new caseworker, Maggie Cole, whereupon respondent expressed her happiness at the change. Blankenship averred that, at this time, respondent had not completed a psychological assessment or any mental health services with UCAN's psychologist, and was not consistently participating in counseling or parenting classes. Nor was respondent meeting with her parenting coach or counselor weekly as ordered, due to her absences from the placement site; she was only meeting with them about once a month.

¶ 10       Finally, Blankenship testified that when she observed respondent with Jordyn, respondent was very attentive to her, making sure she was fed and soothed. She admitted

5

that respondent acted appropriately toward Jordyn and never felt that respondent was a physical threat to the child. However, Blankenship stated that respondent did "put the baby in harm's way" and agreed with the decision to put Jordyn in protective custody, since respondent had come into the same care due to severe abuse by Antoinette and there was suspicion that respondent was leaving Jordyn at Antoinette's home, which was where DCFS investigators had, at one point, found the child.

¶ 11    Maggie Cole, respondent's subsequent case manager, testified that when she took over respondent's case, there were already several service referrals in place and still open for her, including a psychological evaluation, parenting services, therapy and a vocational program. Respondent had not yet completed the psychological evaluation and was not consistent with her parenting classes or therapy; and, she was enrolled in school and UCAN's life skills program, but was not attending either one. Cole further averred that, as of the time of the hearing, respondent had yet to begin any of these ordered services. Regarding respondent's behavior toward Jordyn, Cole noted that she had only seen the two together once, during which time respondent was very attentive to the child; Cole had no concerns that respondent would be physically aggressive toward Jordyn. Cole also testified that, in February 2014, she met with respondent, who indicated that she wanted to reestablish a relationship with her mother, Charletta, and that she wanted Jordyn to be a part of that relationship, as Charletta was Jordyn's grandmother.

¶ 12    Ivory Flucas, a DCFS child protection investigator, testified that he was assigned to Jordyn's case in January 2014 to investigate the allegation that respondent was leaving Jordyn with Charletta. Flucas stated that he met with respondent in early January 2014 and explained to her that someone had reported that she had been leaving Jordyn with Charletta,

that Charletta had prior indicated reports against her, and that Charletta had a history of being in violent relationships. Respondent admitted that she had brought Jordyn to Charletta's home and was interested in developing a relationship with her so that Charletta could also develop a relationship with Jordyn. Flucas told respondent that this was not an appropriate place to leave Jordyn. Respondent told Flucas she was not aware that Charletta presented a danger to Jordyn, but that she would no longer leave Jordyn with her as she valued Jordyn's safety over a relationship with Charletta.

¶ 13    Flucas further testified that he and his supervisor had a subsequent conversation with respondent on January 30, 2014, to explain to her that her decision making was endangering Jordyn and that she needed to abide by UCAN's instructions concerning Jordyn's safety. Respondent told Flucas that she was leaving Jordyn with the child's father. Flucas asked respondent to provide information about the father's identity so that UCAN could perform a safety assessment and explained that until such an assessment was done on anyone she wanted to leave Jordyn with, UCAN would not approve of her leaving the child with that person. Respondent refused to provide any information regarding Jordyn's father.

¶ 14    Flucas averred that he met with respondent the next day, January 31, 2014, to again explain to her that UCAN and DCFS were mandated to ensure Jordyn's safety and that she needed to follow UCAN's rules regarding this, including those with respect to who could care for the child. Also at this meeting, a safety plan was formed, which respondent signed. Pursuant to the plan, respondent could not leave Jordyn alone with anyone until a family meeting was held, which was scheduled for February 7, 2014. Flucas stated that this safety plan was put into place because there was no one with whom respondent could leave Jordyn that UCAN felt comfortable. He also noted that respondent's judgment was flawed and she

had not yet shown the ability to safely choose someone to care for Jordyn. Flucas explained to respondent that if she violated this safety plan, DCFS had the authority to remove Jordyn from her care.

¶ 15    Flucas next testified regarding the February 7, 2014 family meeting, at which he, his supervisor, several UCAN staff members and respondent were present. Respondent, however, did not have Jordyn with her. When asked where she was, respondent said that Jordyn was not with her father or her maternal grandmother, but respondent refused to disclose who was caring for her. Flucas asked respondent to make Jordyn available, but she refused, saying she did not trust DCFS or UCAN; she also again refused to disclose any information about the child's father. Flucas grew concerned because, as discussed during their last meeting, respondent had yet to show that she knew how to make appropriate decisions regarding Jordyn's safety. In addition, Flucas noted that, as per the January 31, 2014 safety plan respondent had signed, the fact that Jordyn was not with her was a violation of the plan. At this point during the meeting, respondent was presented with a new safety plan. Under its rules, respondent could not leave Jordyn with anyone unless UCAN approved and respondent would have to make Jordyn available to her parenting coach once a week; if respondent did not follow these rules, DCFS would be able to take protective custody of the child. Respondent initially refused to sign this safety plan, but then did so after about 45 minutes.

¶ 16    Flucas further testified that immediately after the meeting, he went to take protective custody of Jordyn because respondent had violated the first safety plan she had signed on January 31, 2014. He went to Antoinette's home with the police; a woman answered the door, refused to allow them to enter the home and stated that Jordyn was not there. The fire

department was called and, after breaking down the door of the home, Jordyn was found therein. Flucas took protective custody of the child, stating that the baby was in danger of serious harm if returned to respondent because of respondent's refusal to follow DCFS and UCAN's instructions and because Antoinette had been determined to be an inappropriate caregiver due to her prior indicated reports. Flucas admitted that he and the staff realized the initial safety plan had been violated as soon as respondent appeared at the February 7, 2014 meeting without Jordyn, but still offered her a second safety plan because they were "caught up in the moment." He explained that safety plans were reviewed every five working days, and that they were reevaluating the January 31, 2014 plan at the February 7, 2014 meeting, which respondent had originally agreed to attend with Jordyn but then did not and refused to disclose her whereabouts. He also noted that when he took protective custody, Jordyn had no marks or physical injuries and did not look malnourished. Flucas ultimately indicated respondent for placing Jordyn in an environment injurious to her health and welfare by her continuous placement of the child with people whom UCAN had not approved.

¶ 17       The State next published respondent's medical records from three hospitals, which it had submitted at the outset of the adjudication hearing. Those from Riveredge Hospital showed that in 2007, respondent was admitted after becoming angry while in a group home; she set a dish towel on fire and tried to hit and bite the staff because they would not give her a radio. These records also indicated that respondent had been diagnosed with ADHD, that her discharge diagnoses were impulse control disorder and bipolar disorder and that she needed individual and group therapy. Respondent's records from Streamwood Hospital documented that she was admitted in early 2008 and that this was her seventh hospitalization. She presented there because there had been multiple daily incidents of her threatening others and

requiring restraint at her group home. These records further revealed that respondent had been removed from her mother and was placed in her grandmother's guardianship, but was then removed in 2006 due to physical abuse by her grandmother beginning at age 4 and continuing to age 12; respondent had a history of reactive attachment disorder, PTSD and aggression. Respondent reported to hospital staff at that time that she had been removed from her grandmother's care after her siblings were found to have signs of physical abuse by her grandmother and her boyfriend, and that her grandmother would hit them with extension cords. And, respondent's records from Hartgrove Hospital disclosed that she was referred there in 2009 from a residential therapy facility because of increasing aggression and outbursts, including getting into fights several times per week with both staff and peers. They also revealed that she had been sexually abused by an uncle and his friend, had previously attempted suicide, and did not know where her mother was.

¶ 18 Respondent testified at the adjudicatory hearing. She stated that after Jordyn's birth in October 2013, she was placed with her at UCAN's Cermak site, where she stayed for two weeks. She then left for three days, taking Jordyn to live with a friend at her friend's DCFS independent living program; respondent explained that she had health and safety concerns about the Cermak site. She averred that she went back and stayed at Cermak until November 2013, when she moved to UCAN's Clyde site. She denied that the move took place because she had engaged in physical altercations with staff and residents at Cermak and stated instead that she moved due to a mice infestation at that site. She also denied that Blankenship was removed from her case because respondent had threatened her and stated instead that, while they had exchanged words, she "never really threatened her" and asked for Blankenship's removal because she was not meeting her needs. And, she further denied withholding

information from Cole about where Jordyn was, insisting that she never kept it secret and that the real reason staff was upset was because she was not sleeping at the UCAN placement with Jordyn.

¶ 19 Respondent further testified that, when Jordyn was in her custody, she took her for two regular medical checkups and was not aware of any complaints from physicians or UCAN staff that Jordyn appeared abused or malnourished. She admitted that she had been taking Jordyn to Charletta's house and stated that she did not know Charletta "already had, like, issues going on" with DCFS. According to respondent, she had been "simply taking [her] daughter to her grandmother's house," and explained that she had only become aware of Charletta's DCFS situation at her first meeting with Flucas in early January 2014. Respondent acknowledged that she signed a safety plan, pursuant to which she understood she was not to take Jordyn to Charletta's house at all (regardless of whether respondent accompanied her) until Charletta's investigation was resolved. She insisted that this was only condition of the initial safety plan, and stated that it did not include the provision that she could not take Jordyn to anyone's home until the subsequent family meeting.

¶ 20 With respect to the February 7, 2014 family meeting, respondent testified that when she arrived, she was asked where Jordyn was, and she promptly revealed that the child was at Antoinette's home, which she believed was not unsafe. She was then asked whether Antoinette had whipped children with an extension cord, whereupon respondent explained that she was aware of this, but that it was only "an allegation;" she admitted that she had been removed from Antoinette's care when she was 12 years old, but denied that it was because she was hit and stated instead that it was because "there were allegations and concerns with other children that were in her home" and a suspicion that Antoinette was allowing someone

else to live there. Respondent further explained that all the children were removed from Antoinette's custody only as "a precaution" and that Antoinette otherwise raised them, they "all turned out intact," and she "did not see how" Antoinette's home "would have been a potentially unsafe environment *** [or] not be safe for [her] child."

¶ 21     Continuing her testimony about the February 7, 2014 meeting, respondent stated that it was held to review the first safety plan and that she was then asked to sign a second one, pursuant to which she was to report to her UCAN placement every night with Jordyn at curfew, she was not to take Jordyn to Charletta's home, and she was not to take Jordyn to the home of the man respondent had named as Jordyn's father as he had not yet been approved. She noted that additional requirements under this plan were that she was to report to UCAN with Jordyn at least once every 24 hours unless she obtained a preapproved overnight stay, she was not to stay overnight with Jordyn anywhere that was not preappoved, and she was to give UCAN information about all the adults who she wanted preapproved. Respondent acknowledged that, essentially, under the plan, she was not to leave Jordyn with anyone who UCAN had not approved as a caretaker. When she received this second safety plan, she told all those present that she wanted to see a handbook verifying that what was included therein did not violate her parental rights. She eventually signed the plan reluctantly and in anger, believing that if she did not, Jordyn would be placed into protective custody. She averred that, after the meeting, she went to pick Jordyn up from Antoinette's home, but Jordyn was already gone. Respondent further testified that the initial safety plan did not specifically state she was not allowed to bring Jordyn to Antoinette's home between the time she signed it and the February family meeting, just not to Charletta's home, to which she did not take the child. She then stated that the second safety plan also did not specifically state she could not bring

Jordyn to Antoinette's home and, if it did, she was not given time to abide by its terms. In respondent's view, she, as a parent, had the right to place Jordyn where she saw fit, as long as there was no reason to believe Jordyn would be harmed and as long as respondent was with her and returned back to UCAN before curfew.

¶ 22    Near the end of the adjudication hearing, the court expressed concern that the safety plans referred to during this cause were not in evidence. The State was able to produce and submit the signature page of the second, February 7, 2014, safety plan certifying that respondent did sign it. The court also asked the parties whether they would consider continuing this matter under supervision pursuant to section 2-20 of the Juvenile Court Act of 1987 (705 ILCS 405/2-20 (West 2014)). After some discussion, the State refused, citing respondent's failure to comply with restrictions outlined in the safety plans in the past. The court then took the matter under advisement. When it reconvened, the court again asked the State whether it would reconsider its position on a continuance under supervision but, again, the State refused, citing respondent's eight prior hospitalizations, uncompleted services, aggressive behavior and the risks she created with respect to the child's safety. The court also reiterated its concern about the fact that the safety plans had not been submitted into evidence. It then explained that it made a "balance sheet" of facts of this case. It noted that respondent had engaged in some services such as parenting classes and sporadic therapy and that, by all accounts, she was attentive to Jordyn, she did not personally pose a threat to her welfare, and the number of confrontations in which she was involved at UCAN markedly declined when she was moved to the Clyde site. However, the court also noted that the "problem here" was respondent's "youth and her aggression against others *** [and her] bad judgment in leaving Jordyn" with those whom she chose. The court found concern with respondent's desire to

13

maintain a relationship with Charletta and encourage one between her and Jordyn. It further commented on the "line of violence that goes through this family" starting with Antoinette, then Charletta and reaching respondent, as well as the fact that respondent was about to age out of the juvenile system and no information had been submitted into evidence regarding where she would live with Jordyn or how she would care for her. At the end of its discussion, the court again decided to continue the matter, in the hope that, via subpoenas, the parties would present the written safety plans and evidence about respondent's future care plans into evidence.

¶ 23    When the court next reconvened, the State tendered as an exhibit section 3 of the February 7, 2014 written safety plan, explaining all its efforts to obtain the complete plans but being unable to locate them. The court accepted the exhibit and read it. Following additional argument, the court concluded that, while this was perhaps "a weak case, nevertheless, *** the State has met its burden as to neglect injurious environment and abuse substantial risk of physical injury." The court specified that this was "the basis for the ruling." In support, it reiterated the evidence presented, including respondent's "terrible childhood" at the hands of her mother and grandmother, Jordyn's grandmother and great grandmother, noting that "the way [respondent] acts today reflects that." It also commented that respondent has been "extremely uncooperative with the services that were offered to her" and has "basically refused to do virtually everything," and considered her disappearances from her placement and her failure to inform anyone where she was. Finally, the court discussed respondent's "threatening" behavior towards others, noting that while it was not directed at Jordyn, it "could well have escalated into physical violence while the child was present." The court stated, "because of that, under the doctrine of anticipatory neglect," it

found by a preponderance of the evidence that the State had met its burden here. It then ordered that respondent would have nine months to engage in services and demonstrate reasonable effort and progress toward reunification.

¶ 24    Immediately after issuing its ruling on the adjudicatory hearing, the court held a dispositional hearing. Ultimately, the court concluded that it was in Jordyn's best interest to be made a ward of the court, finding both parents unable, and respondent unwilling, to provide for her care. The court commented that "this has been an ongoing effort to get [respondent] engaged and she's just refused." Finally, with respect to permanency, the court heard argument and concluded that it is "in Jordyn's best interest to accept the goal of return home [in] 12 months."

¶ 25                                    ANALYSIS

¶ 26    On appeal, respondent's only contention is that the evidence was insufficient to support the trial court's determination following the adjudicatory hearing that Jordyn was neglected due to injurious environment and abused due to substantial risk of physical injury. She asserts that the court's basis of "anticipatory neglect" is against the manifest weight of the evidence because it applies only to cases where there is evidence of harm to siblings of the child at issue at the hands of the responsible parent and, as Jordyn is respondent's only child, this doctrine was inapplicable here. Respondent further argues that there was no evidence of either neglect or abuse to Jordyn while in her custody, and she takes issue with both the age of the evidence surrounding her hospitalizations (*i.e.*, that there has been no evidence of a diagnosis or hospitalization since 2009) and that the service plans were not admitted into evidence.

¶ 27      As a threshold matter, we wish to make clear for the record exactly what respondent is appealing before this court. As all the parties acknowledge, respondent included, her notice of appeal states that she is appealing from the trial court's adjudication, disposition and permanency orders. However, and again as all the parties acknowledge, respondent included, her brief on appeal challenges only the findings of abuse and neglect at the adjudicatory phase. Accordingly, this is the only matter before our court. In fact, we note that respondent purposefully abandons any additional challenges, as she states that "there is no basis to appeal the [disposition and permanency] orders" and that she "is not arguing for reversal of those orders in this Brief." Therefore, and by the consensus of all parties involved, we proceed with a review of only the trial court's adjudication order. See *In re R.S.*, 382 Ill. App. 3d 453, 464 (2008) (while mother's notice of appeal sought review of trial court's disposition order regarding child, her failure to address that ruling in her brief on appeal resulted in waiver of that issue).

¶ 28      Turning to the merits of this cause, we begin with several legal principles concerning neglect and abuse, as these are the adjudicatory findings of the trial court which respondent challenges here. The Juvenile Court Act of 1987 defines neglected and abused minors, in relevant part, as follows:

> "(1) Those who are neglected include:
>
>     ***
>
>     (b) any minor under 18 years of age whose environment is injurious to his or her welfare; ***
>
>        * **
>
> (2) Those who are abused include any minor under 18 years of age whose

parent ***:

***

(ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(1), (2) (West 2014).

"Neglect" is the failure to exercise the care that circumstances justly demand, and encompasses both willful and unintentional disregard of parental duty. See *In re Sharena H.*, 366 Ill. App. 3d 405, 415 (2006); accord *In re Kamesha J.*, 364 Ill. App. 3d 785, 792-93 (2006). As noted above, a "neglected minor" includes any child under age 18 whose environment is injurious to his welfare. See *Kamesha J.*, 364 Ill. App. 3d at 792; *In re T.S-P.*, 362 Ill. App. 3d 243, 248 (2005) (a child can be found neglected if his environment is injurious to his welfare). An "injurious environment" is "an amorphous concept that cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter" for her children. *Kamesha J.*, 364 Ill. App. 3d at 793; accord *Sharena H.*, 366 Ill. App. 3d at 416; *T.S-P.*, 362 Ill. App. 3d at 248. This is because our courts have consistently recognized that a parent has a duty to keep her children free from harm, and her refusal to do so clearly amounts to neglect under the statute. See *Kamesha J.*, 364 Ill. App. 3d at 793.

¶ 29    Again, the terms "neglect" and "injurious environment" do not have fixed and measured meanings but, rather, take their content from the particular circumstances of each case. See *Sharena H.*, 366 Ill. App. 3d at 415; *Kamesha J.*, 364 Ill. App. 3d at 793; *T.S-P.*, 362 Ill. App. 3d at 248. Therefore, cases involving such allegations are *sui generis* and must be

17

decided on the basis of their unique facts. See *Kamesha J.*, 364 Ill. App. 3d at 793. The State has the burden of proving the allegations by a preponderance of the evidence. See *Sharena H.*, 366 Ill. App. 3d at 415; accord *Kamesha J.*, 364 Ill. App. 3d at 793; *T.S-P.*, 362 Ill. App. 3d at 248. On review, a trial court's findings in this regard will not be reversed unless they are against the manifest weight of the evidence. See *Sharena H.*, 366 Ill. App. 3d at 415 (reviewing court is to give deference to trial court's findings of fact, as trial court is in best position to observe conduct and demeanor of parties and witnesses, assess credibility and weigh evidence presented at adjudicatory hearing); accord *Kamesha J.*, 364 Ill. App. 3d at 793. A trial court's findings are against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. See *In re Faith B.*, 359 Ill. App. 3d 571, 573 (2005). Ultimately, the trial court "has broad discretion in determining the existence of neglect and abuse" (*In re B.W.*, 216 Ill. App. 3d 410, 414 (1991)), and there is a "strong and compelling presumption in favor of the result reached by the trial court" in such child custody cases (*Connor v. Velinda C.*, 356 Ill. App. 3d 315, 323 (2005)). And, we may affirm the trial court's ruling if any of its bases of abuse or neglect may be upheld. See *In re Kenneth D.*, 364 Ill. App. 3d 797, 802 (2006) (citing *In re Faith B.*, 216 Ill. 2d 1, 14 (2005)).

¶ 30     In the instant case, the trial court's findings of neglect based on injurious environment and abuse based on substantial risk of physical injury were not against the manifest weight of the evidence.

¶ 31     Respondent's main argument here is, as we noted earlier, that the trial court's findings cannot stand because it misapplied the concept of anticipatory neglect to her cause. Citing *In re Arthur H.*, 212 Ill. 2d 441 (2004), she states that the "theory of anticipatory neglect" refers only "to sibling abuse while in the care of the parent," that is, that a finding of neglect based

on injurious environment or a finding of abuse based on substantial risk of physical injury may only be found under this concept if they are based upon the parent's similar behavior toward a sibling of the minor in question. In her view, then, and only then, may such findings be applied to the parent's relationship with the minor child at issue. She continues by insisting that, because Jordyn is her first and only child, and because she (respondent) is not the responsible parent for any other children including a sibling of Jordyn's or, more precisely, a sibling of Jordyn's who has been neglected or abused while in her care, the trial court's findings are automatically against the manifest weight of the evidence and must be reversed. As respondent's characterization of the doctrine of anticipatory neglect is entirely incorrect, we wholly disagree.

¶ 32     Respondent is correct that in *Arthur H.*, a trial court made findings of neglect premised on anticipatory neglect as to the child at issue who resided with the father, based upon what occurred with several of his siblings who resided with the mother. See *Arthur H.*, 212 Ill. 2d at 468. Following the father's appeals, our state supreme court eventually reversed the trial court determinations, finding that the State failed to prove the allegations of neglect with respect to the named minor in relation to his father. In its decision, the court discussed anticipatory neglect and noted that it upheld its primary concept, namely, that " 'the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury.' " *Arthur H.*, 212 Ill. 2d at 477 (quoting *In re Brooks*, 63 Ill. App. 3d 328, 339 (1978)). The court made clear that the only reason for its reversal in that case was the specific circumstances presented with respect to the named child which, in the court's view, amounted to mere speculation of a risk of harm and failed to sustain the State's burden of proof. See *Arthur H.*, 212 Ill. 2d at 477-78.

¶ 33    From this, however, respondent blindly leaps to the unfounded conclusion that the doctrine of anticipatory neglect can only be applied in cases where, as in *Arthur H.*, the minor at issue has siblings and the parent at issue is responsible for them. She exclusively links its applicability to a concept of transference–to be an applicable doctrine, the minor must have siblings who were neglected or abused and, since Jordyn has none, it cannot apply to her case. It is here where respondent's assertions fall apart.

¶ 34    Not only does respondent not provide us with any legal precedent to validate her argument, she specifically ignores the discussion of anticipatory neglect provided by our state supreme court in *Arthur H.* and reaffirmed by its progeny. As *Arthur H.* makes clear, transference of any sort may have some place in the doctrine of anticipatory neglect, but it is a very minor one. As that court stated, "[u]nder the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused other children." *Arthur H.*, 212 Ill. 2d at 468. Thus, anticipatory neglect protects both victims of neglect or abuse and those who may become neglected or abused. The court described that anticipatory neglect "flows from the concept of an 'injurious environment' " and, likewise, there is no *per se* rule that neglect or abuse of one child conclusively establishes, or does not establish, the neglect of another child–it amounts only to admissible evidence. *Arthur H.*, 212 Ill. 2d at 468-69. Accordingly, as with any neglect or abuse finding, the court specified that findings made under this doctrine " 'should be measured not only by the circumstances surrounding the sibling, but also by the care and condition of the child in question.' " *Arthur H.*, 212 Ill. 2d at 468 ("[e]ach case concerning the adjudication of minors, including those

cases pursued under a theory of anticipatory neglect \*\*\*, must be reviewed according to its own facts" (quoting *In re Edward T.*, 343 Ill. App. 3d 778, 797 (2003))).

¶ 35    Thus, even under anticipatory neglect, neglect or abuse to a sibling becomes incredibly less important than what is occurring with, and to, the specific minor in question, who is to be the central focus.  It is, of course, relevant, but it is not determinative.  See *Arthur H.*, 212 Ill. 2d at 468-69.  Subsequent case law on the issue echos the same principles.  For example, our very court restated as much in *Kenneth D.*, wherein we described anticipatory neglect as not only a legal principle which seeks to protect those children who have a probability of being subject to neglect or abuse from an individual who has been found to have neglected or abused another sibling child, but also, and ultimately, as a method to protect, additionally, those children who are direct victims of neglect or abuse.  See *Kenneth D.*, 364 Ill. App. 3d at 801.  Again, we noted that while what has occurred with, or to, a sibling is relevant, the "care and condition of the child named in the petition" is key and must be taken into account.  See *Kenneth D.*, 364 Ill. App. 3d at 801; accord *In re Edricka C.*, 276 Ill. App. 3d 18, 26 (1995).  Moreover, our courts have repeatedly emphasized that the statutory provisions, which we outlined earlier, require simply "an injurious *environment* or substantial *risk* of harm" in order to sufficiently support a finding of neglect or abuse and, once this has been found, the trial court need not wait until the child becomes a victim or is permanently emotionally damaged to remove her–regardless of what has occurred with a sibling.  *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995) (emphasis in original); accord *In re D.W.*, 386 Ill. App. 3d 124, 138 (2008); *In re T.B.*, 215 Ill. App. 3d 1059, 1062-63 (1991); *In re A.D.R.*, 186 Ill. App. 3d 386, 393-94 (1989).

21

¶ 36    While respondent's characterization of anticipatory neglect presupposes a somewhat clever legal technicality, our review of this doctrine, and more importantly, of the cause before us, will not proceed in such a limited manner. To interpret anticipatory neglect as applicable only to children who have siblings would cause such a narrow interpretation of the concept as to render it absurd, something we will not do in the critical context of child custody cases. We are called here to ultimately address the best interest of Jordyn in light of the circumstances presented; no unsubstantiated legal maneuvering will hold us back. Therefore, we find, contrary to respondent's insistence, that anticipatory neglect was properly applicable to the instant cause.

¶ 37    Even were this not so, we note, briefly but formidably, that the bases of the trial court's adjudication of neglect and abuse here were injurious environment (neglect) and substantial risk of physical injury (abuse). From our review of the record, the trial court mentioned anticipatory neglect only one time in the midst of several continued appearances of the parties in court, doing so orally when it was discussing the instances in evidence in which respondent had engaged in confrontations with UCAN staff and peers which the court noted "could well have escalated into physical violence while the child was present." The court never stated anticipatory neglect was the basis for its decision and, in fact, did not enter a finding of it; rather, it entered official findings of injurious environment and substantial risk of physical injury, which it explicitly specified were "the basis for the ruling." Accordingly, it is these latter findings we must review, not any asides regarding anticipatory neglect which, as the record shows, did not form the basis of the trial court's decision at issue.

¶ 38    In that regard, respondent continues her argument by asserting that, apart from any consideration of anticipatory neglect, the trial court's determinations of neglect and abuse

following the adjudicatory hearing cannot stand because the State failed to prove that Jordyn was neglected or abused. She cites evidence from the record indicating that Jordyn was never "injured or harmed in any way while in [her] custody," that Jordyn was not bruised or malnourished, that Jordyn was otherwise properly cared for, and that she (respondent) was shown to be an attentive and nonthreatening mother to Jordyn. She further states that simply because she "was disrespectful, or verbally antagonistic, or engaged in several fights with peers that resulted in no harm, or threatened to put her hands on the caseworker, are not proof of neglect or abuse to Jordyn." However, based on the record before us, we find that the State amply met its burden here of proving neglect and abuse by a preponderance of the evidence and, thus, that the trial court's determinations were not against the manifest weight of the evidence.

¶ 39    Respondent is correct that the evidence presented demonstrates, for all intents and purposes, that Jordyn, at least at this time, is a healthy and nourished child who has not been injured or harmed, that respondent has taken her to the doctor, and that respondent cares for her. But, this does not mean that Jordyn is not neglected and abused. Again, we have discussed at length that all that is needed to substantiate a finding of legal neglect and abuse under statutory terms is proof by a preponderance of the evidence of an injurious *environment* or a substantial *risk* of harm. See *M.K.*, 271 Ill. App. 3d at 826; accord *D.W.*, 386 Ill. App. 3d at 138; *T.B.*, 215 Ill. App. 3d at 1062-63; *A.D.R.*, 186 Ill. App. 3d at 393-94. And, again, our courts have made clear that we need not wait until a child becomes a victim of physical abuse or permanent emotional damage before such a finding may be upheld. See *M.K.*, 271 Ill. App. 3d at 826; accord *D.W.*, 386 Ill. App. 3d at 138; *T.B.*, 215 Ill. App. 3d at 1062-63; *A.D.R.*, 186 Ill. App. 3d at 393-94.

¶ 40     Accordingly, while Jordyn's case is not one of the more dire this court has seen, it is no less critical. As the record shows, respondent herself was a made a ward of the court. She was taken from the custody of her mother Charletta and placed with her grandmother Antoinette, and later taken from Antoinette and placed in group homes. Both women were indicated in adjudication and dispositions orders from 2001 through 2011 for respondent and her several siblings, who were found to be neglected based on injurious environment and lack of necessary care, and abused based on substantial risk of physical injury. There was documentation that respondent's siblings were whipped with belts and extension cords and beaten so severely as to sustain multiple fractures and even permanent disability. There were further reports that unauthorized paramours were allowed by these women to live in their homes with respondent and her siblings. Despite her very own experience, and ignoring over a decade of neglect and abuse, respondent has repeatedly chosen to leave her infant daughter in Charletta's and Antoinette's homes, a choice that is clearly very dangerous.

¶ 41     However, what is even more worrisome is the fact that respondent seems to believe that there is nothing wrong with her choice. For example, respondent testified that she did not know that Charletta had "issues going on" with DCFS and only found out about this after speaking to Flucas for the first time in January 2014; she also repeatedly testified, and expressed to others, that all she was doing was "simply taking her daughter to her grandmother's house," and she wanted her daughter to have a relationship with Charletta. And, with respect to Antoinette, she stated that she did not believe Antoinette's home was unsafe for Jordyn and all the incidents for which DCFS had indicated Antoinette were just "allegations." Yet, her testimony lies in direct contradiction to all the information presented in the record regarding Charletta and respondent's own comments to hospital staff during her

many visits, wherein she explained that Antoinette had been physically abusive and had hit her and her siblings, for which she was removed from her care and custody. From all this, it is clear that there is a cosmic disconnect within respondent when it comes to Jordyn's safety–either she does not care about it, or she is psychologically blinded by what she herself experienced that she cannot make appropriate decisions on this issue. Either way, this disconnect is clearly affecting her judgment at the cost of Jordyn's safety.

¶ 42      Respondent further takes issue here with the fact that the written safety plans involved in this cause were not submitted into evidence. Citing the trial court's comments about them being missing from evidence, she insists that the State could not have met its burden of proving that Jordyn was abused and neglected without them. We, just as the trial court here, acknowledge that much time was spent in this cause discussing the safety plans, namely, the initial plan from January 2014 and the subsequent plan from February 2014. However, we, again just as the trial court, find the fact they were not submitted into evidence to be irrelevant and not prohibitive of the decision rendered. First, the record makes clear that the trial court spoke at length with all the parties about why the safety plans could not be located; it listened to all the parties with respect to what occurred with the actual documents. The State was able to provide the court with two sections of the February safety plan, including respondent's signature. Second, there was much testimony regarding what was contained in the safety plans, particularly from Flucas, who testified at length about their formation, their content, and their explanation to respondent at the time she signed them, as well as from respondent, who disputed some of the requirements, including whether the plans specifically prohibited her from leaving Jordyn with Charletta and/or Antoinette. The trial court heard all this testimony and ultimately made credibility determinations in this regard–determinations

that, without more, we are not at liberty to refute. See *Sharena H.*, 366 Ill. App. 3d at 415; accord *In re Marriage of Petraitis*, 263 Ill. App. 3d 1022, 1035 (1993) (reviewing court "will not second guess the trial judge's determinations regarding credibility" of witnesses in child custody cases). Third, and most critically, the ultimate issue in this cause is not whether respondent violated the January or February safety plans, or even whether DCFS proceeded properly in taking custody of Jordyn immediately after the second safety plan was executed. It is whether the State met its burden in proving by a preponderance of the evidence that Jordyn is neglected due to an injurious environment and abused due to a substantial risk of physical injury. We, as did the trial court, find that the State has, indeed, met its burden here. That respondent wants to limit this discussion to technicalities, *i.e.*, that as long as there was nothing specific in the safety plans regarding with whom she may leave Jordyn, she may leave her with whomever she chooses, will not be condoned.

¶ 43     Finally, respondent's own history and conduct cannot be overlooked here. Again, she herself was, until recently, a ward of the court who was herself subjected to horrendous violence and abuse. Clearly, there are lingering issues within her, as she has chosen to return to those who inflicted that violence and abuse, and has chosen to bring her infant daughter with her. Respondent's medical records show repeated psychiatric hospitalizations during her earlier teen years before she became pregnant with Jordyn. These demonstrate anger issues and violence toward others–peers as well as those who hold positions of authority over her. Included therein are diagnoses of ADHD, impulse control disorder, bipolar disorder, reactive attachment disorder, and PTSD. She has been beaten and sexually violated at the hands of her very own family members, and she even attempted suicide. Presumably, these

issues have not been treated, as she has refused to be psychologically evaluated since her last documented hospital stay in 2009.

¶ 44       Once respondent became pregnant, these issues did not resolve themselves. In fact, they seemingly grew more intense. At this time, caseworker Blankenship was assigned to respondent. She immediately referred respondent for parenting and counseling services, assigned her a counselor and referred her to UCAN's psychologist for an evaluation. Respondent refused to participate in services. Once Jordyn was born, respondent reported feelings of postpartum depression and Blankenship again referred her to her counselor and UCAN's psychologist. Again, respondent refused to meet with the psychologist and was not meeting regularly with her therapist, either. Instead, respondent established a pattern of leaving placement with Jordyn for days at a time, returning without the infant, staying the night, and then leaving again for several days, while refusing to tell site personnel where she was going or where Jordyn was. She also refused to provide any information regarding who was caring for Jordyn, including the infant's father. Respondent grew more combative when she was told she would have to report to placement with Jordyn once every 24 hours. Eventually, UCAN personnel determined that respondent should be moved from its Cermak site to its Clyde site due to her several, and repeated, aggressive altercations with peers and staff–some which became physical and took place in Jordyn's presence. Respondent's move led to the incident with Blankenship, during which respondent threatened her with physical violence to the point that Blankenship had to be removed from respondent's case for safety reasons. Following her move to the Clyde site, the number of altercations in which respondent was involved decreased. However, again, her issues were not resolved. As her new caseworker, Cole, described, almost all of respondent's service referrals were still open.

She still refused to be psychologically evaluated, and she did not participate in parenting services and personal therapy, as ordered. She was enrolled in school and UCAN's life skills program, but she was not attending either one. Even at the time of the trial court proceedings in this matter, respondent had not maintained consistent participation in, or even begun, her assigned services.

¶ 45     It has been said that it takes a village to raise a child. Unfortunately, the village respondent has chosen to help her raise Jordyn is one dominated by serious potential violence and meriting great concern. In addition, she has made this choice knowingly, having herself experienced this exact same violence in her own past and in spite of all the redemptive chances and services repeatedly offered to her via UCAN and DCFS. She has elected not to trust them with the safety of her child and, inexplicably, to instead trust those who the record shows have certifiably neglected and abused children in the past. This poor decision making, coupled with her consistent failure to participate in services as assigned to her, sufficiently support the trial court's decision that Jordyn is neglected due to an injurious environment and abused due to a substantial risk of physical injury.

¶ 46     We would note that the disposition order in this cause seeks a return home of Jordyn to respondent in 12 months. This gives respondent 12 months to come to terms with her issues, to seriously begin the completion of necessary services, and to put herself on the correct path toward proper decision making when it comes to Jordyn's safety and overall care. We sincerely hope she chooses to do so.

¶ 47                                         CONCLUSION

¶ 48      Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

¶ 49      Affirmed.