NOTICE
Decision filed 12/23/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220497-U

NO. 5-22-0497

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* CHRISTOPHER H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 22-JA-60 |
| v. | ) | |
| | ) | |
| Consuela D., | ) | Honorable |
| | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's order of adjudication finding the minor neglected and abused was not against the manifest weight of the evidence. The trial court's dispositional order making the minor a ward of the court and granting guardianship to the Illinois Department of Children and Family Services was not against the manifest weight of the evidence or an abuse of discretion.

¶ 2    The respondent-guardian, Consuela D., appeals the Macon County trial court's order of adjudication finding Christopher H. neglected and abused and the order of disposition finding it was in Christopher's best interest to make him a ward of the court and to grant guardianship to the Illinois Department of Children and Family Services (DCFS). We affirm the trial court for the following reasons.

1

¶ 3                          I. BACKGROUND

¶ 4    Christopher was born June 9, 2011. Consuela D. is Christopher's grandmother and guardian. Neither of Christopher's biological parents are parties to this appeal.

¶ 5    On March 22, 2022, the State filed a petition for adjudication of wardship alleging (1) Christopher was neglected because his environment was injurious to his welfare in that Consuela had ongoing, untreated substance abuse issues and there were ongoing domestic violence issues in the home and (2) Christopher was abused because Consuela created a substantial risk of physical injury to Christopher due to Consuela's ongoing, untreated substance abuse issues and there were ongoing domestic violence issues in the home.

¶ 6    DCFS filed a shelter care report with the court on March 22, 2022. The report indicated Christopher was removed from the home after he reported Consuela choked him the weekend of February 26, 2022. Christopher indicated Consuela had been drinking when the incident occurred. According to Christopher, Consuela would start drinking in the morning and continue doing so throughout the day on a daily basis. She would argue when she drank, get mean for no reason, yell at him and his brother, and sometimes called him the devil. Occasionally, he and his brother had to carry Consuela to bed because she would be better after she slept. Christopher reported that Consuela would lock herself in the bathroom for extended periods of time and he and his brother had to urinate in a bucket. He stated Consuela's boyfriend moved out of the home because he was afraid of getting stabbed.

¶ 7    The report stated the caseworker interviewed Consuela in her home on March 3, 2022. She observed the home to be "disheveled" and the glass in the back door as well as the glass in the window by the driveway were broken. She further observed Consuela to be intoxicated; Consuela "was staggering and her words were slurred." Consuela told the caseworker she drank three or four

2

shots of vodka that morning. She further told the caseworker the back door window was broken by her granddaughter when they had an altercation. Consuela indicated the other window was broken by her ex-boyfriend when they had an altercation. The report stated that the caseworker offered Consuela intact services, which she accepted at that time.

¶ 8    The report indicated the caseworker then interviewed Christopher's older brother, Tristan, who also lived in the home. Tristan reported that Consuela drank daily and got angry with him and Christopher for no reason. He further reported that he tried to keep Christopher in the bedroom while Consuela was angry. He indicated there was constant fighting in the home with Consuela. Tristan stated that Consuela and her boyfriend drank together and the two of them fought. He corroborated Consuela's statement that her ex-boyfriend broke the window by the driveway.

¶ 9    The report further indicated that on March 7, 2022, the caseworker spoke with Ms. Keizer, Christopher's teacher. Ms. Keizer indicated Christopher was sometimes very sleepy when he came to school, and he told her fighting in the home would wake him during the night. She further reported Christopher told her Consuela had been drinking and choked him and he wondered what heaven would be like. Ms. Keizer indicated to the caseworker that Christopher stated he tried to go to a bedroom away from Consuela while she drank but she would call for him to come out. She further stated Christopher told her he would try to get Consuela to eat and go to bed.

¶ 10    The report stated that on March 8, 2022, the caseworker contacted Consuela to advise her she needed to complete a toxicology screening. However, Consuela did not appear for the screening. When the caseworker texted Consuela the following day, Consuela stated, "I thought through it beforehand you [c]an take him! I won't work to gethimback [*sic*]."

¶ 11    The report indicated that on March 21, 2022, when the caseworker and the intact caseworker tried to speak with Consuela about starting services, Tristan answered the door and

3

appeared nervous. Tristan stated Consuela was in bed. When asked if Consuela had been drinking that day, Tristan said yes. The caseworker left her card and asked Tristan to give it to Consuela. Consuela called the caseworker shortly thereafter. The caseworker stated Consuela's speech was slurred and mostly incoherent. Consuela sounded as if she were speaking to another person, but the caseworker heard no one else's voice. Consuela then ended the call. The report stated the investigator called back Consuela who hung up on her after she identified herself as being from DCFS. When the investigator again called Consuela, she reported Consuela stated she would not do services, was tired of dealing with the children, and was too old to be a caretaker. Consuela told the investigator to pick up Christopher from school and she would not try to get him back. When the investigator inquired about relatives with whom Christopher could be placed and if Consuela would gather his belongings, Consuela responded by stating it was the investigator's problem.

¶ 12 Four minutes later, Consuela called the investigator's supervisor stating that DCFS was taking away her child and "f*** him up." When the supervisor told Consuela that the problem was her drinking, Consuela denied drinking. The supervisor offered to reschedule the intact service initiation but told Consuela she would have to undergo a toxicology screening. Consuela refused the screening. Thereafter, DCFS took protective custody of Christopher.

¶ 13 The shelter care report further indicated that, after being taken into care, Christopher was evaluated by a nurse practitioner. The nurse practitioner observed that he had very rotten upper molars which appeared to have been present for a long time and had not been addressed by a dentist. The report stated Consuela scheduled five medical appointments after April 8, 2021, for Christopher, but failed to appear for three of them and canceled one. The court conducted the shelter care hearing on March 22, 2022. The hearing was not on the record, but the trial court entered a written order placing temporary custody of Christopher with DCFS.

¶ 14   On June 13, 2022, the trial court conducted the adjudication hearing. The State called Christopher, Christina Graybeal, and Jessica Stafford as witnesses. Christopher testified in chambers that Consuela drank alcohol in the bathroom at night. He stated that in late February 2022, Consuela choked him and tried to rip up his artwork. Although she did not choke him hard, Consuela put her hand on his throat. He was not scared other than being afraid that she was going to rip his artwork as drawing was one of his favorite things to do. He further testified Consuela got angry at people when she was drunk. She also argued with her boyfriend after she had been drinking in the bathroom and yelled at Christopher and his brother.

¶ 15   Christina Graybeal, a child welfare specialist with DCFS and the family's caseworker, testified regarding her investigation at Consuela's house, her conversation with Tristan, and her telephone calls with Consuela. Her testimony was consistent with the above-mentioned report.

¶ 16   Jessica Stafford, an intact caseworker with Webster Cantrell Youth Advocacy (WCYA), also testified. She indicated that she accompanied Ms. Graybeal to Consuela's home for a transitional visit in which she would assume the reins for an intact case. She did not speak with Consuela because Consuela would not come to the door. Because she was unable to see Consuela, an intact case was never opened. Following Ms. Stafford's testimony, the State rested.

¶ 17   The defense called Consuela as a witness. She testified that she did not choke Christopher. She stated she may have had to put her hand in front of him to stop him because "Chris gets aggressive too." She disputed drinking every day or drinking to the point of intoxication and stated, "once I get to feeling some type of way, I go lay down and go to sleep." When asked if she usually consumed alcohol when she knew she would be able to go to asleep without having to attend to the children, she stated that she did not need to sleep because she was intoxicated, but because she worked a lot. Consuela stated that sometimes she drank alcohol when she was cleaning in the early

5

morning hours while the children were sleeping. She would sometimes have a shot of alcohol around 1 a.m. and another a couple hours later. However, "I'm not just sitting there drinking to be drunk. It's just a little buzz." She denied continuing to drink throughout the day. She did not know what she could have said to have given Ms. Graybeal the impression that she consumed alcohol to the extent to which Ms. Graybeal testified.

¶ 18   Consuela further testified her granddaughter punched out the window in the door. The two had not been arguing. Instead, her granddaughter had been running away and otherwise misbehaving. Consuela was trying to get her to go to school and the granddaughter got angry. Consuela's ex-boyfriend broke the other window while she and the children were locked inside the house. Consuela denied locking herself in the bathroom for extended periods of time so that Christopher and Tristan had to urinate in bottles. No further evidence was presented.

¶ 19   The trial court found the State had proven by a preponderance of the evidence the allegations of the petition for adjudication and adjudicated Christopher neglected and abused due to being in an injurious environment as a result of Consuela's ongoing substance abuse issues and ongoing domestic violence issues. It further found Ms. Graybeal's testimony to be credible. The court ordered the preparation of a dispositional report and set the matter for a dispositional hearing. Thereafter, it admonished Consuela of her responsibility to cooperate with the agency, comply with the requirements of the service plans, and correct the conditions that brought Christopher into foster care, or risk losing her guardianship rights over him.

¶ 20   DCFS filed the dispositional report on July 7, 2022. According to the report, Consuela's recommended services were to obtain a mental health assessment, obtain a substance abuse assessment, participate in parenting education, and participate in domestic violence services. The report indicated Consuela had not engaged in any of these services.

¶ 21    The trial court conducted the dispositional hearing on July 13, 2022. Consuela stipulated to entry of the dispositional order and agreed to the State's recommendation that Christopher be made a ward of the court and DCFS be granted guardianship. The trial court stated it was relying on the contents of the dispositional report which recommended Christopher remain in DCFS care to allow Consuela to correct the conditions that brought Christopher into care. It thereafter found it to be in Christopher's best interest that he be made a ward of the court and that DCFS be awarded guardianship with the power to place Christopher and to consent to his medical treatment. The trial court again admonished Consuela of her responsibility to cooperate with the agency, comply with the requirements of the service plans, and correct the conditions that brought Christopher into foster care. A written dispositional order was filed on July 19, 2022. Consuela timely appealed.

¶ 22                                    II. ANALYSIS

¶ 23                                    A. Adjudication

¶ 24    "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). The determination of whether a minor should be made a ward of the court is a two-step process. 705 ILCS 405/1-1 *et seq*. (West 2020); *In re Z.L.*, 2021 IL 126931, ¶¶ 58-59. The first step occurs at the adjudicatory hearing and addresses whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2020). At this stage, the State must prove the allegations in the petition by a preponderance of the evidence. *In re Z.L.*, 2021 IL 126931, ¶ 61. A preponderance of the evidence means that the allegations "are more probably true than not." *Id*. We will not overturn a trial court's findings of neglect and abuse unless they are against the manifest weight of the evidence. *In re Faith B.*, 216 Ill. 2d 1, 13-14 (2005). "A finding is against the manifest weight of the evidence

7

only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d at 464. "Ultimately, there is a 'strong and compelling presumption in favor of the result reached by the trial court' in child custody cases." *In re William H.*, 407 Ill. App. 3d 858, 866 (2011) (quoting *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 323 (2005)).

¶ 25    Section 2-3(1)(b) of the Juvenile Court Act of 1987 in pertinent part provides:

> "(1) Those who are neglected include:
>
> ***
>
> (b) any minor under 18 years of age or a minor 18 years of age or older for whom the court has made a finding of probable cause to believe that the minor is abused, neglected, or dependent under subsection (1) of Section 2-10 prior to the minor's 18th birthday whose environment is injurious to his or her welfare[.]" 705 ILCS 405/2-3(1)(b) (West 2020).

¶ 26    "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d at 463. Here, the State alleged that Christopher was in an injurious environment due to Consuela's ongoing, untreated substance abuse issues and ongoing domestic violence issues in the home. "[O]ur courts have interpreted 'injurious environment' to include the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." *In re N.B.*, 191 Ill. 2d 338, 346 (2000) (quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)). Our supreme court has defined neglect as the " 'failure to exercise the care that circumstances justly demand.' " *Id.* (quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)).

¶ 27    On appeal, Consuela argues the trial court's finding of neglect due to Christopher being in an injurious environment was against the manifest weight of the evidence. She contends the State's

8

focus on her alcohol consumption was misplaced because she only drank when Christopher was sleeping and while she was cleaning. She further contends she did not choke Christopher as evidenced by his having demonstrated "choking" as merely a hand to his chest. Consuela maintains she was not trying to choke Christopher but, rather, was merely trying to stop him after he became aggressive. She argues that at no time was Christopher physically harmed. Consuela avers the State presented no evidence to prove that she failed to exercise care or that she willfully or intentionally disregarded her parental duties. We disagree.

¶ 28 The State presented a plethora of evidence revealing Consuela failed to exercise the care necessary when raising an 11-year-old child. Here, the trial court had the onus of determining the credibility of the family's caseworker, Ms. Graybeal, and Consuela. It specifically found Ms. Graybeal credible. Both Christopher and Tristan described Consuela's drinking to Ms. Graybeal and how it negatively affected them. Both of them spoke of hiding and having to urinate in a bottle or a bucket when Consuela was intoxicated and would lock herself in the bathroom. Moreover, Ms. Graybeal observed Consuela intoxicated firsthand. She told the caseworker that she would start drinking in the morning and continue throughout the day. Ms. Graybeal also observed the home had a disheveled interior and the broken windows. When queried about how the windows were broken, Consuela admitted they were broken during arguments: one by her ex-boyfriend and one by her granddaughter. More than once, Consuela told Ms. Graybeal that she no longer wanted to care for Christopher and would not try to get him back. Christopher's testimony was consistent with Ms. Graybeal's testimony, including how Consuela put her hands on him.

¶ 29 In addition to the State's evidence, Consuela's testimony did not support her present argument. She admitted drinking early in the morning to the point of getting a "buzz." She also admitted having windows broken by family members during arguments or disagreements. Actual

9

harm is not required for a trial court to make a finding of neglect. *In re D.F.*, 201 Ill. 2d 476, 497 (2002). Rather, a risk of harm is sufficient. *Id.* While it may be arguably true that Christopher was not physically injured or that Consuela did not intentionally neglect him, neglect encompasses both willful and unintentional disregard of parental duty. *Labrenz*, 411 Ill. at 624; *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 28. It is difficult to see how exposure to ongoing substance abuse and domestic violence would not place a child in an injurious environment where there is a risk of harm. Moreover, Consuela's arguments on appeal essentially ask this court to redetermine the credibility of the witnesses, which we may not do. *In re Abel C.*, 2013 IL App (2d) 130263, ¶ 19 ("This court will not reweigh evidence or make an independent determination of credibility.").

¶ 30    Taking the evidence as a whole, we find that the trial court's adjudication finding Christopher neglected due to an injurious environment was not against the manifest weight of the evidence as the opposite conclusion is not clearly evident. Since we have determined the trial court's finding of neglect due to an injurious environment as set forth in count I of the petition for adjudication of wardship was not against the manifest weight of the evidence, we need not review the trial court's finding of abuse. *In re Faith B.*, 216 Ill. 2d at 15.

¶ 31                                B. Disposition

¶ 32    Once the State proves the allegations of abuse or neglect by a preponderance of the evidence, the trial court then proceeds to the second stage. *In re Arthur H.*, 212 Ill. 2d at 464. At the second stage, the trial court must determine whether "it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." (Internal quotation marks omitted.) *Id.* "A trial court's dispositional decision regarding a minor rests within the court's discretion and will not be overturned unless it is against the manifest weight of the evidence or the

10

court abused its discretion by selecting an inappropriate disposition." *In re William H.*, 407 Ill. App. 3d at 866.

¶ 33    In this case, Consuela stipulated and agreed to the entry of the dispositional order. A party is bound by a stipulation since the stipulation eliminates the need for the other side to produce evidence. *Klucznik v. Nikitopoulos*, 152 Ill. App. 3d 323, 331 (1987). Thus, Consuela is bound by her stipulation. As such, we find the trial court's dispositional order was neither against the manifest weight of the evidence nor an abuse of discretion.

¶ 34                             CONCLUSION

¶ 35    For the foregoing reasons, we affirm the trial court's adjudicatory and dispositional orders.


¶ 36    Affirmed.