2016 IL App (1st) 152034

No. 1-15-2034

Opinion filed March 9, 2016

THIRD Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* HARRIETT L.-B., a Minor, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Respondent-Appellee | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | No. 14 JA 1014 |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | The Honorable |
| v. | ) | Richard A. Stevens, |
| | ) | Judge Presiding. |
| Tinisha L.-B., | ) | |
| | ) | |
| Respondent-Appellant). | ) | |

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Mother/respondent-appellant Tinisha L.-B. (respondent) appeals from both the trial court's adjudicatory order finding that her daughter, minor/respondent-appellee Harriett L.-B. (Harriett), was neglected and its dispositional order declaring that respondent was unable and unwilling to care for her. She contends that the trial court misapplied the doctrine of anticipatory neglect, and that its findings based on medical evidence in the record were contrary to the manifest weight of the evidence and in derogation of case law governing the

practice of medicine as well as her constitutional rights regarding her own medical care. She asks that we reverse, vacate or declare void "all [o]rders entered against her in this matter" and remand for proceedings consistent with the immediate return home of Harriett. The State and Harriett's public guardian have filed appellees' briefs. For the following reasons, we affirm.

¶ 2                                     BACKGROUND

¶ 3      Harriett was born to respondent on August 20, 2014 via a home birth. The record reveals that respondent had another child, D.K., born in December 2002, who was separated from respondent when D.K. was two or three years old and who currently lives with her maternal grandmother.

¶ 4      In mid-September 2014, the State filed a petition for adjudication of wardship and a motion for temporary custody for Harriett, citing neglect due to injurious environment and substantial risk of physical injury. The petition noted that Harriett was born at least one month premature; that respondent tested positive for marijuana at Harriett's birth; that respondent has epilepsy and seizures; that Harriett's father, Lyonal L.-B. (Lyonal),[1] refused to cooperate with the Department of Children and Family Services (DCFS); that the parents acted erratically at the hospital after Harriett's birth; and that respondent has another child not in her care.

¶ 5      On September 18, 2014, the trial court conducted a temporary custody hearing, at which both parents were present. Jerome Watkins, a DCFS child protective investigator, testified that he was assigned to Harriett's case following a hotline call. Watkins stated that he spoke

---

[1] Lyonal voluntarily acknowledged paternity of the minor (which was verified by testing) and has been married to respondent since June 2014. He is not a party to this appeal.

to a hospital social worker who confirmed Harriett was in the neonatal intensive care unit, that respondent had experienced a seizure at home prior to giving birth, that the father had been present but respondent reported that he "took his time calling for assistance," and that respondent tested positive for marijuana. Watkins also discussed with the social worker that hospital staff had some problems with the parents visiting the hospital, including their leaving the hospital with Harriett's medical records and their refusal to return them. Watkins then spoke with a doctor at the hospital who had cared for Harriett; although Harriett did not test positive for marijuana, she had exhibited some withdrawal symptoms such as not feeding well, which the doctor related to respondent's use of marijuana. Watkins also spoke to Yvette Hughes, the building service coordinator of Lyonal's apartment building where he and respondent lived. Watkins confirmed with her that the building was a senior citizens' residence, that respondent was known to have seizures, and that there was some delay on Lyonal's part in calling the ambulance on the day of Harriett's birth. Watkins further testified that he visited with respondent at the hospital and with Lyonal at their apartment. With respect to respondent, Watkins testified that she confirmed the information regarding Harriett's birth but denied that she was a drug user, explaining that she had used marijuana only once and it must have still been in her system. Watkins and respondent discussed her history of seizures, and respondent provided him with the name of her doctor and the medication she takes. With respect to Lyonal, Watkins testified that he went to the apartment to conduct a home assessment but Lyonal did not permit it. Watkins returned some days later with the police, whereupon Lyonal threatened him; when asked about the nature of the threat, Watkins would not and/or could not recall it. Watkins stated he was still able to conduct his home assessment and did not find any safety concerns. Finally, Watkins spoke

3

to Harriett's maternal grandmother who cares for D.K. and who expressed concern to him regarding respondent's ability to care for Harriett. Based on all this, Watkins took protective custody of Harriett, assessing that she would not be safe in the care of the parents essentially due to Lyonal's noncooperation and respondent's seizures. At the close of this hearing, the trial court found that there was "more than sufficient evidence for a finding of probable cause" of neglect in this case based on respondent's positive toxicology on the day of Harriett's birth, combined with the information Watkins obtained from the doctor. The court then went on to find that there was also "sufficient evidence" of the urgent and immediate necessity to remove Harriett and place her in the temporary custody of DCFS, citing the maternal grandmother's concerns, Lyonal's behavior, and the parents' actions at the hospital. The court ordered service assessments be conducted for both Lyonal and respondent, as well as supervised visitation with Harriett.

¶ 6    The cause then proceeded to an adjudicatory hearing. Yvette Hughes testified that she was the resident service coordinator at the Minnie Riperton Apartments for seniors and disabled tenants of the Chicago Housing Authority, coordinating social services for the residents, including respondent and Lyonal, such as assisting with food, income, electricity and obtaining medical insurance. Hughes stated that she witnessed respondent have seizures on several occasions and called an ambulance each time to assist her. She recalled one incident when she saw respondent have a seizure and hit the concrete. Hughes recounted that she witnessed respondent have several seizures in the months of January, February, March, April, May and June of 2014, and 7 to 10 seizures in July 2014, the month before Harriett was born. Hughes noted that even though respondent would be taken to the hospital by ambulance, she would walk home and return the same day. Respondent was usually alone

when she had the seizures. Hughes averred that when she found out about respondent's pregnancy, she met with her several times to assist her in obtaining a medical card and food. She also met with Lyonal to assist him in obtaining income, as neither he nor respondent had any. Hughes described that a few weeks later, they met again and Lyonal was "really angry" that he had not received any money yet; he "yelled" at Hughes and ran out of her office. Hughes further testified that on the day of Harriett's birth, she saw an ambulance take respondent, who was holding the newborn while on a stretcher, from the apartment to the hospital.

¶ 7        Watkins testified as to his visit with Lyonal at the apartment when police were present. Just as during the temporary custody hearing, Watkins described that their conversation did not "go well" and that Lyonal said "things that were not kind," but could not remember exactly what these were; Watkins did state that Lyonal did not want to listen to anything he (Watkins) had to say. Watkins then testified about a subsequent conversation the two had some days later, when Watkins called to inform Lyonal about hearing dates. Watkins stated that Lyonal responded he would come to court only via subpoena and immediately ended the conversation. Watkins described that Lyonal then called him back the same day and threatened to come to court and "take [him] out." Watkins at this time noted that this was the same threat of physical violence Lyonal made when Watkins went to the apartment for the home assessment, when police were called.

¶ 8        The trial court next accepted exhibits presented by the State, which included the transcript of the temporary custody hearing, Harriett's medical records, and respondent's medical records. Harriett's medical records revealed that she was born at home at 35 weeks' gestation, that respondent tested positive for cannabis but she did not, and that she had

hypothermia, hypoglycemia, sepsis and thickened frenulum of the upper lip; she was in the hospital's special care nursery. Her records also noted several instances involving the parents and hospital staff. For example, Lyonal visited Harriett on August 24, 2014, showed concern and was appropriate with her, but smelled of alcohol and looked "unclean." On August 29, 2014, both respondent and Lyonal visited her; however, when told they had to wait for DCFS clearance, Lyonal threatened to take Harriett "away from here." A social worker then tried to calm Lyonal down; security was called and it was noted that Lyonal was "aggressive/agitated" in dealing with DCFS. On August 31, 2014, Lyonal was told by hospital staff that Harriett had lost 10 grams of weight, but was otherwise eating well. Lyonal accused the nurse of not feeding Harriett and asked her if his "voice threaten[ed]" her, if she was "going to get a gun and shoot" him, and mentioned something about "supremacy issues." Also on that date, a nurse observed Lyonal feeding Harriett while she was flat on her back and informed him that Harriett needed to be fed upright for safety. Lyonal became defensive and told the nurse that he had raised seven children. On September 3, 2014, a nurse discovered that Harriett's medical records were missing. She contacted the parents, whereupon Lyonal wanted to know when Harriett would be discharged and told her that they would bring the records back when she was ready to be discharged. The next day, respondent returned Harriett's medical records to the hospital, but the footprint sheet was missing. A nurse asked if they would return it, but Lyonal stated they would not because his name was not listed as Harriett's father. Notations were also made in Harriett's medical records in September 2014 stating that respondent and Lyonal were now barred from visiting the special care nursery because of threats to hospital staff.

6

¶ 9      Respondent's medical records revealed that she was admitted to the emergency room repeatedly for seizures both before and during her pregnancy with Harriett. Hospital staff each time recommended follow-up treatment and laboratory analysis of her medication levels. For example, in February 2013, respondent was admitted following an incident in which witnesses reported an altercation between Lyonal and respondent during which respondent was pushed into a wall, struck her head and had a seizure; at the hospital, respondent denied any recollection of the altercation. In January 2014, now pregnant with Harriett, respondent was admitted twice for seizures; her medication levels were subtherapeutic (indicating she was not taking sufficient medication for her seizures) and, during one of these admissions, she refused to stay and wait for medication to be administered. In March 2014, respondent was admitted for multiple seizures and told staff that she was compliant with her medication, but then explained that she had run out of it two days earlier. Lyonal told hospital staff he attempted to get her medication but was informed that her insurance was not active. Respondent was placed on a "charity medication program," but left the hospital against medical advice. In April 2014, respondent was admitted for a seizure; records from the hospital noted that her "boyfriend" was abusive to staff and had to be escorted out by security. Respondent refused to be admitted to the hospital and left against medical advice; while waiting at the hospital for a ride home, she suffered another seizure, again refused to be admitted and again left against medical advice. On May 23, 2014, respondent, who was now 5½ months pregnant, was admitted for a seizure but left against medical advice. Later that same day, she was admitted again, having had another seizure, and refused any medication even after being informed about risks to her and her baby. On July 9, 2014, respondent was admitted for a seizure, and her records indicated

that she reportedly ran out of medication, she has been unable to fill her prescriptions, and she admitted that she has not followed up with any doctor as directed upon her previous admissions nor has she had any prenatal care or taken prenatal vitamins. On August 20, 2014, the day of Harriett's birth, respondent's medical records noted that she had a seizure that day and was in "very poor prenatal care," having presented for only two prenatal visits and never completing labwork or an ultrasound. Her pregnancy was also complicated by preeclampsia. The records further noted that respondent provided "inconsistent information" regarding her history, which included "a longstanding history of seizures" that "has been poorly controlled due to patient noncompliance" and "chronically subtherapeutic" medication levels. Respondent was "very agitated" and insisted that, if continually told she had to stay at the hospital, she would " 'get up and walk the f*** up out of here,' " even after being warned about the health risks of doing so. Respondent's seizures were classified as tonic clonic[2] epilepsy, and she reported that just a week before, she suffered a seizure with a postictal period[3] of 10 minutes but had not presented for care. Respondent's medical records also included a mother/baby psych assessment, which stated that respondent tested positive for marijuana use and scant prenatal care, was noncompliant with medication and attending scheduled appointments, and has sudden changes in mood and temperament. The assessment further noted that she "has difficulty communicating cohesively" and "varies in response" when asked questions, providing "different explanations of events" and taking "pauses in middle of sentences," unable to form her thoughts. Regarding Harriett's home birth, respondent described that the "baby started to 'push herself out' " and " 'wanted to get out saying you doing something wrong and I need to get out now.' " Respondent at first reported

---

[2] This is more commonly known as grand mal seizures.
[3] This is the altered state of consciousness after an epileptic seizure.

being in pain, then stated she had not experienced any pain at all, and explained she did not want to go to the hospital or see a doctor during the birth. Rather, she waited until the baby started to crown before asking her husband to call an ambulance. Similarly, regarding her drug use, respondent at first denied using marijuana, but then stated she started smoking it when she was 13 years old; she stated she stopped smoking it a year ago but then reported she smoked it within the week prior to Harriett's birth.

¶ 10        At the close of the adjudicatory hearing, the trial court found that the State had "met [its] burden of proof by a preponderance of the evidence," noting that this was "not really a close case." The court then reviewed the evidence, noting that it was "more than sufficient to establish anticipatory neglect." This included Hughes' testimony, which it found "was credible" with respect to the fact that respondent was repeatedly having seizures, as corroborated by the medical records presented. The court also noted that these records demonstrated respondent "was not compliant" with her medical appointments or medication, and that she was "self-medicating with marijuana." The court appreciated both respondent and Lyonal's "not being happy" with DCFS' involvement. However, it concluded that Lyonal's "complete noncooperation with DCFS *** combined with his abusive attitude toward hospital staff" and "the totality of the evidence here" supported its belief that "this minor would be at risk of being neglected if the child had remained with the parents as opposed to being taken into protective custody." Accordingly, the trial court issued an adjudication order finding Harriet to be neglected due to an injurious environment based upon anticipatory neglect.

¶ 11        The matter then proceeded immediately to a dispositional hearing. The State submitted into evidence an Integrated Assessment (IA) conducted by DCFS on respondent. While the

IA averred that respondent had visited Harriett prior to November 2014 and was otherwise cooperative and respectful, it also stated that respondent exhibited "impaired judgment," citing as examples her prolonged illegal substance abuse, including while pregnant with Harriett, and her having left D.K. home alone as an infant, leading to her removal.  The IA also revealed that five years ago, respondent had been diagnosed with schizophrenia and bipolar disorder, but she had not received any treatment and there was no current diagnosis. The IA noted that because respondent was not attentive to her own medical needs, it was likely that she may not be able to adequately care for Harriett and described that if she were to experience a seizure while caring for the child, she could possibly subject her to injury (*i.e.*, if holding her) or otherwise be unable to provide care for her.  From all this, DCFS recommended the following services for respondent: a psychiatric assessment, individual therapy, a substance abuse assessment, parenting education, a domestic violence assessment, child-parent psychotherapy (when deemed appropriate), visitation with Harriett and compliance with medical and mental health treatment.

¶ 12     Carlos McFarlane, Harriett's case manager, testified that he was assigned in November 2014.  Lyonal had already been assessed for services, and it was recommended that he complete a psychiatric assessment and an integrated assessment interview.  McFarlane stated that Lyonal had repeatedly refused to participate in any services or come to court, and to date he had not done so.  In addition, neither Lyonal nor respondent had visited Harriett since he was assigned to the case eight months ago.  With respect to respondent, McFarlane testified that she, too, had not to date participated in any of her recommended services; she had at first indicated she would, but then stated she would not once Lyonal became involved in the conversation.  On one occasion when McFarlane went to the parents' apartment, respondent

indicated she wanted to take care of Harriett, but Lyonal accused McFarlane of holding Harriett illegally and said he would not participate in visits unless McFarlane left Harriett with him. McFarlane did not speak with respondent again because he did not feel safe going back to the apartment to meet with her. With respect to Harriett, McFarlane testified that she lives with her foster mother, who is also her maternal aunt; they originally lived in an apartment but recently moved in with Harriett's maternal grandmother who cares for respondent's other child, D.K. Harriett was experiencing some "respiratory problems" of late, but her foster mother obtained her prescribed medication and she is otherwise doing well, developmentally on target and with no special needs. McFarlane recommended that Harriett be adjudged a ward of the court.

¶ 13    At the close of the dispositional hearing, the State asked that Harriett be adjudged a ward of the court based on a finding of unable, unwilling and unfit with respect to respondent and Lyonal. The public guardian agreed with the State on this point, and following further discussion about respondent in particular, asked that "she also be found unfit." Respondent, meanwhile, asked the court "for a finding of unable only," arguing that no evidence had been submitted demonstrating that she was unfit or unwilling to parent Harriett.[4]

¶ 14    After considering all the statutory factors, the trial court found that "it is in the best interest of the minor and the public that the minor be adjudged a ward of the Court." The court noted that neither parent had been participating in any of the reunification services. It also found McFarlane to be "very credible" and commended him for continually maintaining communication with the parents to help them regain custody of Harriett. The court concluded that, based on the evidence presented, respondent and Lyonal were "just not

---

[4] For the record, Lyonal similarly asked for a finding of unable only.

willing to participate, at this point, in any reunification services or visits with their child." Accordingly, it held both respondent and Lyonal "unable for reasons other than financial circumstances alone to care for, protect, train or appropriately discipline the child," and further found them to be "unwilling to parent," but refused to find them unfit to parent Harriett. The court set a permanency goal of return home pending a status hearing.

¶ 15                                    ANALYSIS

¶ 16        As noted, respondent presents two contentions on appeal. Her first focuses on the trial court's adjudicatory finding that Harriett was neglected due to an injurious environment based on anticipatory neglect. Relying principally on *In re Arthur H.*, 212 Ill. 2d 441 (2004), she asserts that the court's basis of "anticipatory neglect" is against the manifest weight of the evidence because it applies only to cases where there is evidence of harm to a sibling of the child at issue at the hands of the responsible parent and, as no evidence was presented that Harriett was ever in respondent's care at the same time as her other child D.K., this doctrine was inapplicable here. From this, she insists that the trial court's misapplication of the doctrine requires reversal of her cause.

¶ 17        Our very court has just recently dealt with this precise matter in *In re Jordyn L.*, 2016 IL App (1st) 150956, a case which we find to be directly on point and wholly dispositive of respondent's contention.

¶ 18        In *Jordyn L.*, the trial court, following an adjudicatory hearing, found the minor to be neglected due to injurious environment and abused due to substantial risk of physical injury " 'under the doctrine of anticipatory neglect.' " *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 23. On appeal, the respondent-mother, identical to respondent herein, argued that the trial court's adjudicatory finding could not stand because it misapplied the concept of anticipatory

12

neglect. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 31. Also citing *Arthur H.*, she, too, insisted that anticipatory neglect refers only to sibling neglect or abuse while in the care of the parent at issue, that is, that a finding of neglect or abuse may only be found under this concept if it is based upon the parent's similar behavior toward a sibling of the minor in question. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 31. The respondent then concluded, just as respondent here, that, because she was not the responsible parent for any sibling of Jordyn who had been neglected or abused while in her care,[5] the trial court's findings were automatically against the manifest weight of the evidence. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 31.

¶ 19     While we found the respondent's citation to *Arthur H.* in relation to the doctrine of anticipatory neglect to be correct, we found her leap from the holding of that cause to her assertion that the doctrine can only be applied in cases where the minor at issue has a sibling for whom the parent at issue is responsible to be "entirely incorrect." See *Jordyn L.*, 2016 IL App (1st) 150956, ¶¶ 31-32. First, in examining *Arthur H.*, the preeminent case on anticipatory neglect, we noted its facts: a trial court had made findings of neglect premised on anticipatory neglect as to the child at issue who resided with the father based upon what occurred with several of that child's siblings who resided with the mother. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 32 (citing *Arthur H.*, 212 Ill. 2d at 468). The father appealed, and our state supreme court reversed, finding that the State failed to prove the allegations of neglect with respect to the named minor in relation to the father. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 32 (citing *Arthur H.*, 212 Ill. 2d at 477). The *Arthur H.* court discussed anticipatory neglect and reiterated its primary basis, namely, that " ' "the juvenile court

---

[5] Jordyn L. was the respondent's first and only child at that time.

should not be forced to refrain from taking action until each particular child suffers an injury." ' " *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 32 (quoting *Arthur H.*, 212 Ill. 2d at 477, quoting *In re Brooks*, 63 Ill. App. 3d 328, 339 (1978)).  It then made specifically clear that the only reason for its reversal was the specific circumstances presented with respect to the named child which, in the court's view, amounted only to speculation of a risk of harm involving the father (rather than the nonresidential mother) and, thus, failed to sustain the State's burden of proof as to the father.  See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 32 (citing *Arthur H.*, 212 Ill. 2d at 477-78).

¶ 20    The respondent in *Jordyn L.*, just as respondent here, attempted to blindly leap from the legal principles espoused in *Arthur H.* to the conclusion that anticipatory neglect could only be applied in cases where, as there, the minor at issue has siblings and the parent at issue is responsible for them, thereby exclusively linking this doctrine to a concept of transference, *i.e.*, to be applicable, the minor must have siblings who were neglected or abused while in the parent's care.  See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 33.  In direct contradistinction, we immediately refuted any transference argument.  See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 33.

¶ 21    Instead, we honed in on the broader discussion of anticipatory neglect as presented in *Arthur H.* and its progeny.  See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 34.  That is, we noted that the theory the respondent was presenting was novel and may have some basis in that anticipatory neglect does, indeed, consider the neglect or abuse inflicted on a sibling of the minor at issue in determining whether to impose a similar finding with respect to that minor.  See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 34.  However, it is not so limited; that consideration is only a small one involved in a much bigger picture that must focus on the

14

minor at issue.  See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 34.  As our supreme court stated, " '[u]nder the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused other children.' "  *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 34 (quoting *Arthur H.*, 212 Ill. 2d at 468).  Thus, we concluded, anticipatory neglect protects both victims of neglect or abuse and those who may become neglected or abused.  See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 34.  And, as such, while evidence of neglect or abuse of a sibling is an important consideration, we found that it is not determinative or conclusive.  See *Jordyn L.*, 2016 IL App (1st) 150956, ¶¶ 34-35 (there is no *per se* rule that neglect or abuse of one child conclusively establishes, or does not establish, the neglect or abuse of another; it amounts only to admissible evidence).  Rather, what is more key is the " ' "care and condition of the child in question," ' " which is to be the central, and primary, focus.  *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 34 (quoting *Arthur H.*, 212 Ill. 2d at 468, quoting *In re Edward T.*, 343 Ill. App. 3d 778, 797 (2003)) (neglect or abuse of a sibling "becomes incredibly less important than what is occurring with, and to, the specific minor in question" (*Jordyn L.*, 2016 IL App (1st) 150956, ¶ 35)); see also *In re Edricka C.*, 276 Ill. App. 3d 18, 26 (1995).

¶ 22       Based on all this, we concluded that anticipatory neglect, then, is "not only a legal principle which seeks to protect those children who have a probability of being subject to neglect or abuse from an individual who has been found to have neglected or abused another sibling child, but also, and ultimately, as a method to protect, additionally, those children who are direct victims of neglect or abuse."  *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 35

(citing *In re Kenneth D.*, 364 Ill. App. 3d 797, 801 (2006)) (regardless of what has occurred with a sibling, a trial court need not wait until the child named in the petition becomes a victim or is permanently emotionally damaged to remove him); see also *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995) (emphasizing that simply an injurious *environment* or substantial *risk* of harm is required to find neglect or abuse and, once found, there is no need to wait for child to actually be harmed); accord *In re D.W.*, 386 Ill. App. 3d 124 (2008); *In re T.B.*, 215 Ill. App. 3d 1059, 1062-63 (1991); *In re A.D.R.*, 186 Ill. App. 3d 386, 393-94 (1989). Accordingly, we rejected the respondent's limited interpretation and specifically held that "[t]o interpret anticipatory neglect as applicable only to children who have siblings would cause such a narrow interpretation of the concept as to render it absurd, something we will not do in the critical context of child custody cases." *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 36. Ultimately, the key issue was the minor's best interest in light of the circumstances presented and, based on the record before us, we found that anticipatory neglect had been properly applied regardless of the fact that no evidence had been submitted regarding any sibling of the child at issue. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 36 (declaring trial court's finding that child was neglected due to injurious environment and abused due to substantial risk of physical injury based on anticipatory neglect to be proper, even though minor was only child, as based on record presented, which included instances of the respondent's aggression, violence towards others, refusal to follow safety plans, and failure to complete services).

¶ 23    The instant cause mirrors *Jordyn L.* and merits the same result. Respondent here makes the same argument regarding anticipatory neglect, namely, that because, at the time of Harriett's removal, she was not responsible for a sibling of Harriett's, anticipatory neglect

could not be used as a basis for the trial court's finding of neglect due to injurious environment. Just as in *Jordyn L.*, we will not limit the doctrine of anticipatory neglect in such a narrow manner. That D.K., who is 11 years older than Harriett, was not in respondent's care at the time Harriett was removed for neglect is not dispositive of anything– at best, it is a factor of interest in this cause, but at worst, it is nothing more than irrelevant. This is because the key here is what was occurring with, and to, the specific minor at issue in the petition: Harriett. She was the trial court's central focus, not D.K. nor D.K.'s presence or absence in respondent's home. In direct contradistinction to respondent's insistence, under the doctrine of anticipatory neglect, Harriett's removal was not required to be premised upon a finding that respondent had also neglected or abused D.K. while D.K. was in her home with Harriett or, for that matter, that she had *ever* neglected or abused D.K. As *Jordyn L.* makes clear, anticipatory neglect can be the premise of such a finding in sibling situations, but it is more broadly, and just as equally, applicable as a method to protect those children who are direct victims of neglect or abuse, regardless of what has happened–if anything–to their siblings–if any.

¶ 24    Accordingly, for these reasons, we find, contrary to respondent's contention, that the trial court did not in any way misapply the doctrine of anticipatory neglect in the instant cause. Rather, it was completely applicable and the trial court did not err in using it as the basis for its finding that Harriett was neglected due to injurious environment.

¶ 25    Respondent's second, and final, contention on appeal is that the trial court's findings that were based on medical evidence in the record were contrary to the manifest weight of the evidence and in derogation of Illinois case law governing the practice of medicine as well as her own constitutional rights. First, in stating that there was a "lack of medical evidence to

17

support the findings," respondent notes that the evidence showed Harriett's health was normal, having not tested positive for marijuana at birth and otherwise testing normal regarding other bodily functions, including her cardiopulmonary, respiratory and neurological function. Next, she asserts that she was an able and willing parent, as the evidence demonstrated she visited Harriett, took her to the hospital, consented to her vaccination, held her and was otherwise respectful and considerate to hospital and DCFS staff. Finally, she insists that she was compliant in her medication and acted within her own rights regarding her medical care, with no testimony from any medical experts presented to the contrary. However, we find that respondent mischaracterizes a good portion of the evidence presented by not rendering a full and fair representation of its totality and, based upon our thorough review of the record, we conclude that the trial court's findings were proper and supported by the evidence.

¶ 26      In this second contention, respondent lumps together the trial court's adjudicatory finding of Harriett's neglect due to injurious environment with its dispositional determination that respondent was unable and unwilling to parent her, declaring that neither of these was supported by the evidence presented. For the record, however, we note that this is a bifurcated or two-step process, where abuse or neglect of the child is determined first, and then her status in relation to the parent is then analyzed. See *In re Prough*, 61 Ill. App. 3d 227, 231-32 (1978). Accordingly, we turn to the adjudication phase first. Briefly, "neglect," as was found here at the adjudicatory stage, is the failure to exercise the care that circumstances justly demand, and encompasses both willful and unintentional disregard of parental duty. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 28 (citing *In re Sharena H.*, 366 Ill. App. 3d 405, 415 (2006)). A neglected minor includes a child whose environment is

"injurious" to her welfare, which has been interpreted as the breach of a parent's duty to ensure a safe and nurturing shelter for that child. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 28 (citing *In re Kamesha J.*, 364 Ill. App. 3d 785, 793 (2006)). These concepts are amorphous, and cases involving such allegations are *sui generis* and must be decided on the basis of their unique facts, including consideration of a parent's past conduct, even a woman's behavior during her pregnancy, to determine whether an injurious environment, and thus neglect, exists for a child after its birth. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29; see also *In re J.W.*, 289 Ill. App. 3d 613, 618 (1997). Upon review of a finding of neglect, which the State must prove only by a preponderance of the evidence, we give deference to the trial court and will not reverse its determination unless it is against the manifest weight of the evidence. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29 (and cases cited therein, noting that trial court has broad discretion and there is strong and compelling presumption in favor of its decision in child custody matters).

¶ 27    In the instant cause, the trial court's adjudicatory finding of neglect based on injurious environment was not against the manifest weight of the evidence. Rather, just as the trial court stated, we too find that this was "not really a close case." First, Hughes, whom the trial court found to be quite credible, testified that, as the resident services coordinator at respondent's apartment building, she had witnessed respondent have seizures on several occasions, many of them throughout the months she was pregnant with Harriett and 7 to 10 of them in the month just before her birth. Hughes called an ambulance each time she witnessed one of these seizures but respondent, who was usually alone when the seizures took place, did not stay at the hospital but, rather, would walk home the same day. Hughes also testified as to Lyonal's aggressive attitude. Watkins, Harriett's DCFS investigator,

corroborated Hughes' description of Lyonal as he discussed multiple aggressive meetings between them, including one where Watkins had to call the police over a threat of physical harm made by Lyonal. In addition, the court examined both Harriett's medical records and respondent's medical records, of which it took extensive note in its decision. Harriett's records demonstrated, contrary to respondent's insistence, that, while she did not test positive for cannabis upon birth and was otherwise normal, she was premature and had hypothermia, hypoglycemia, sepsis and thickened frenulum of the upper lip. Because of this, Harriett was placed in the special care nursery upon her admission to the hospital. Her records further recorded several instances of disturbances from Lyonal, including threats of her removal, aggressive and agitated behavior, accusations, inappropriate care and threats of violence. And, respondent and Lyonal removed Harriett's medical records from the hospital, refusing to return them until Harriett was released to their care and finally returning them, but with a page missing.

¶ 28    Even more telling were respondent's own medical records, upon which the trial court focused during its adjudicatory finding. These indicated a repeated pattern of respondent, both before and during her pregnancy with Harriett, being admitted to the emergency room following a seizure, hospital staff finding subtherapeutic medication levels in her system, and respondent refusing treatment and leaving against medical advice, only to return to the hospital a short time later–sometimes on the same day–having had another seizure. Respondent's records also show that she has repeatedly admitted to being noncompliant with both her medication and any follow-up care ordered. She reported she was unable to fill her prescriptions because she did not have insurance or it was not active, but she had been placed on a charity medication program by the hospital. Respondent's seizures were not minor but,

rather, classified as tonic clonic epilepsy; she admitted that just a week before Harriett's birth, she experienced such a seizure and was in an altered state of consciousness for at least 10 minutes following it, but never presented for care. She also failed to obtain any prenatal care, save for two visits, and did not complete any labwork or an ultrasound during her pregnancy with Harriett. Not only was her pregnancy complicated by preeclampsia, but respondent had a home birth after waiting until the baby crowned before calling for an ambulance. Moreover, respondent tested positive for marijuana when Harriett was born. She insisted she had stopped smoking the drug a year before, but later admitted to hospital staff that she had smoked it the week before Harriett's birth. And, in respondent's mother/baby psych assessment, notations were made about her sudden changes in mood and temperament, her difficulty in communicating cohesively, and her inability to form her thoughts while pausing in the middle of sentences and providing different explanations of the same events.

¶ 29      All this clearly establishes, as the trial court found, that there was "more than sufficient" evidence to support a finding of neglect due to injurious environment. Contrary to respondent's assertions, Harriett was not born without health concerns, and she herself was not compliant in her medication. This evidence further raised concerns about respondent's ability to ensure a safe and nurturing shelter for Harriett, as demonstrated by her sudden mood changes, her inability to form cohesive thoughts and her drug use, along with her history of epilepsy and its effects on respondent. Accordingly, based on the unique facts of this cause, we find that the trial court's adjudicatory finding of neglect due to injurious environment was not contrary to the manifest weight of the evidence.

¶ 30      Having discussed the adjudicatory phase of Harriett's cause, we now turn to the dispositional order entered herein, which comprises a somewhat different analysis. Once a

child has been adjudged neglected and/or abused, a trial court may commit her to wardship upon a determination that the parent is either unable or unwilling or unfit, for some reason other than financial circumstances alone, to care for, protect, train or discipline the child and that the health, safety, and best interests of the child will be jeopardized if she remains in the custody of the parent. See *Kamesha J.*, 364 Ill. App. 3d at 795; see also 705 ILCS 405/2-27(1) (West 2014). Any one of these three grounds alone–either unable or unwilling or unfit–provide a proper basis for removal. See *In re Lakita B.*, 297 Ill. App. 3d 985, 992-93 (1998). The trial court's determination regarding this, similar to an adjudicatory finding of neglect or abuse, will be reversed only if the factual findings at the dispositional hearing are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. See *Kamesha J.*, 364 Ill. App. 3d at 795.

¶ 31    In regards to the issues she raises with respect to this phase of Harriett's cause, we note, as a threshold matter, that respondent has essentially forfeited any challenge to the dispositional order in this cause. As we noted earlier, following Harriett's adjudicatory hearing and finding of neglect based on injurious environment, the cause immediately proceeded to a dispositional hearing. At its close, respondent asked the trial court that it enter "a finding of unable only," arguing that no evidence had been submitted demonstrating that she was unfit or unwilling to parent Harriett. The trial court found her both unable and unwilling, but not unfit. Accordingly, then, respondent conceded that she is unable to parent Harriett. A finding on this ground alone is sufficient to uphold a trial court's dispositional order. See *Lakita B.*, 297 Ill. App. 3d at 992-93. Therefore, with respondent's concession that she is unable to parent Harriett, any current challenge to the trial court's dispositional order is waived and any issue regarding the trial court's additional finding that respondent

was unwilling is moot.  See *Lakita B*., 297 Ill. App. 3d at 992-93 (holding that issue of whether trial court properly found mother to be unfit to care for her children was moot where she conceded that the court properly found her unable to care for them); accord *In re J.B.*, 332 Ill. App. 3d 316, 321-22 (2002) (where father conceded he was unable to care for minor, issue of whether the trial court's additional finding that he was also unfit was moot); *In re M.B.*, 332 Ill. App. 3d 996, 1004 (2002) (where mother only challenged the unfitness finding but did not assert error regarding the trial court's determination that she was unable, issue of whether unfitness finding was proper was moot).

¶ 32    Even if not moot, the evidence presented in this cause was nonetheless sufficient to support the trial court's determination of both unable and unwilling here.  Respondent's IA, which was admitted during that dispositional hearing, made clear that, while she had visited Harriett prior to November 2014, she had not done so since then.  This was corroborated by McFarlane, Harriett's case manager, who stated almost eight months had passed without a visit.  The IA further revealed that respondent exhibited "impaired judgment," had long ago been diagnosed with schizophrenia and bipolar disorder but did not receive treatment, and was inattentive to her own medical needs, making it likely that she could not adequately care for Harriett, particularly if she were to experience a seizure while holding her or caring for her.  The IA recommended various services for respondent, including psychiatric, substance abuse and domestic violence assessments, individual therapy, child-parent psychotherapy, visitation with Harriett and compliance with medical and mental health treatment.  McFarlane also testified that, while she at first indicated she wanted to take care of Harriett and would participate in services, respondent later told him she would not and, in fact, had not performed any of the recommended services.

¶ 33    Clearly, as the trial court found here, respondent has not participated in any service recommended to her in an effort to be reunited with Harriett. She has exhibited no willingness to do so, nor to even visit her child. Based on all this, we find that the trial court's determination that respondent was unable and unwilling to parent Harriett was not against the manifest weight of the evidence.

¶ 34    As a final note, we wish to comment directly to respondent's constitutional arguments, as she devotes a considerable portion of her appellate and reply briefs to these concerns. Citing cases in line with *Roe v. Wade*, 410 U.S. 113 (1973), respondent insists that she has "a protected constitutional right pursuant to the privacy penumbra, to make decisions regarding her own medical care," and that there is no legal duty for her or any woman in this state to have medical or prenatal care at all. From this, she contends that she should not have had findings made against her by the trial court as a consequence of her acting within her constitutional rights.

¶ 35    Respondent is correct that a woman, even one who is pregnant, has the right to refuse medical treatment (*In re Brown*, 294 Ill. App. 3d 159, 170-71 (1997)); and, indeed, there is no recognized cause of action for a minor seeking damages from a mother for prenatal injuries (*Stallman v. Youngquist*, 125 Ill. 2d 267, 275 (1988)). However, the issue here, over which respondent glosses, is not what her medical rights are. Rather, the issue is whether her conduct, including her past conduct while pregnant, provides a sufficient basis upon which the trial court could find that Harriett is a neglected minor meriting her removal from respondent's care. The trial court found, with ample support in the record, that Harriett was neglected due to injurious environment and that her removal was necessary because respondent was unable and unwilling to parent her. That respondent does not want to subject

herself to doctors or their medical care and chooses instead to have repeated grand mal seizures accompanied by postictal periods of altered consciousness without any medical assistance to stop them is her concern, as is her decision not to participate in any of the services DCFS has recommended for her reunification with Harriett.  However, that respondent's conduct in making these choices affects the security and welfare of this minor child who is unable to care for herself and who would clearly be at serious risk at this point in time if in respondent's custody is our concern, and one which we do not take lightly.  Whatever respondent's medically related constitutional rights are, they do not override Harriett's rights to a safe and nurturing environment.  The trial court's determinations in this cause were wholly proper based on the circumstances presented.

¶ 36                                    CONCLUSION

¶ 37        Accordingly, for all the foregoing reasons, we affirm both the trial court's adjudicatory order finding that Harriett was neglected due to injurious environment based on anticipatory neglect and its dispositional order finding that respondent is unable and unwilling to parent Harriett at this time.

¶ 38        Affirmed.