2023 IL App (1st) 230997-U

SIXTH DIVISION
November 3, 2023

No. 1-23-0997

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF J.H., a minor, | ) | |
| | ) | Appeal from the |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellee, | ) | |
| | ) | No. 22 JA 435 |
| v. | ) | |
| | ) | Honorable |
| K.H., | ) | Diane M. Pezanoski, |
| | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The court's finding that the minor was abused and neglected was not against the manifest weight of the evidence.

¶ 2    Respondent K.H. appeals from an order adjudicating her three-year-old daughter, J.H., abused and neglected.  For the following reasons, we affirm the judgment.

¶ 3                                        BACKGROUND

¶ 4      J.H. was born in June 2020 to K.H.  She is three years old.  Her father is unknown.
During the pendency of this case, the putative father was T.H.

¶ 5      In June 2022, the State filed a petition for adjudication of wardship for J.H. and a motion
to place her in the temporary custody of the Illinois Department of Children and Family Services
(DCFS). The State's petition alleged J.H. was neglected due to an injurious environment and
abused due to substantial risk of physical injury, pursuant to sections 2-3(1)(b) and 2-3(2)(ii) of
the Juvenile Court Act (JCA). 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2022).  The State alleged
the following facts:

> "Mother has five prior indicated reports for cuts, bruises, welts, abrasions, oral injuries
> and substantial risk of physical injury/environment injurious to health/welfare by
> neglect/abuse. Mother was previously offered intact and services were outstanding at the
> time of case closure. Mother has untreated mental health issues. On June 3, 2022 this
> minor's half-sibling participated in a forensic interview wherein she disclosed that
> putative father has sexually abused her on multiple occasions over the past several years.
> There is a history of domestic violence between mother and putative father. Parents
> reside together and paternity has not been established."

¶ 6      The trial court placed J.H. in the temporary custody of DCFS on June 13, 2022. The
State's petition alleged T.H. was J.H.'s father. However, in August 2022, after DNA testing
showed T.H. was not J.H.'s biological father, the trial court entered a finding of non-parentage,
and T.H. was dismissed from the case as a party.

¶ 7      The adjudication hearing was held on May 11, 2023, over videoconference.  At the

hearing, the State admitted multiple exhibits including K.H.'s medical records from Mt. Sinai Hospital, Access Community Health, and Northwestern Medicine, and a copy of a video of a victim sensitive interview ("VSI") with J.H.'s half-sister, D., regarding her allegations of sexual abuse by D.'s father and K.H.'s paramour, T.H. K.H. objected to the admission of her medical records from Mt. Sinai, arguing they were irrelevant because they were from 2014, 2016, and 2019, prior to J.H.'s birth. K.H. also objected to the admission of the video of D.'s VSI. The trial court overruled both objections.

¶ 8 The medical records showed that in January 2019, K.H. was treated at Mt. Sinai Hospital for groin and hip pain. The records state that "1 week ago her baby daddy kicked her at her right hip around the area that's currently tender." In November 2019, K.H. was treated at Mt. Sinai Hospital for "facial pain and chest pain after a physical altercation. Patient states she was punched in the face and chest multiple times by a significant other."

¶ 9 K.H.'s medical records from Access Community Health Network contain records from November 2013 noting she had a history of bipolar and schizophrenic disorder. A note from December 2013 states K.H. had a history of psychiatric hospitalizations and depressive symptoms but did not follow up on recommended outpatient care. A note from March 2020 states K.H.'s anxiety and depression were resolved, but she was still diagnosed with bipolar disorder. A note from September 2021 states K.H. was generally happy. The note states she is a domestic violence victim. A note from March 2021 states K.H. had a "human bite on the left thigh. States that this occurred 7 days ago."

¶ 10 K.H.'s Northwestern medical records state that on June 23, 2021, which was five days after J.H.'s birth, K.H. was at Northwestern emergency medicine in Winfield, Illinois, and she

wanted to see a social worker. K.H. was told she could not see a social worker without first being assessed by a doctor, and K.H. became "belligerent and started screaming at staff" and security was called. K.H. became "physically aggressive with [waiting room] furniture."

¶ 11    In September 2021, K.H. went to Northwestern Medicine in Winfield, Illinois due to lower abdominal pain, which she had been experiencing "since she was punched by her boyfriend 2 to 3 weeks ago. Patient then recants this and says the pain [has been there] for last 2 to 3 days."

¶ 12    D.'s VSI occurred on June 3, 2022, at the Child Advocacy Center. D.'s father is T.H. D. was 13 years old at the time of the interview, and she stated that beginning at age three, she "kind of got raped by my dad." She claimed T.H. would show her pornography on his phone and a TV and asked her to perform oral sex on him. She described T.H. pushing her head down towards his penis. She said T.H. told her to put baby powder on his penis. She described T.H. showing her condoms and "liquid stuff." She described abusive events by T.H. that occurred at her grandmother's home in South Carolina. She stated that T.H.'s abuse stopped for some time because he went to prison but when he was released from prison, he resumed his sexual abuse of D. D was 11 years old at the time. D. also said she saw T.H. beat K.H., and said she knew J.H. almost ate rat poison and knew how to "put out cigarettes." J.H. was present in the home during some of the sexual abuse.

¶ 13    Serina Mathena, a DCFS child protection investigator testified for the State. Mathena stated that she was assigned to this case in May 2022 to investigate the allegation that T.H., who lived with K.H. and J.H., sexually abused his 13-year- old daughter, D. On May 20, 2022, Mathena met with D. and K.H. at their home. D. told Mathena that "she had experienced some

unsafe touch, and she named her father, [T.H.] as the perpetrator of this unsafe touch." D. further reported that the abuse started when she was "very young" and had "gone on for years." D. reported the sexual abuse stopped for some time but had recently restarted.

¶ 14    Mathena testified that K.H. has other children and had five prior indicated DCFS reports from 2015, 2016, 2018, 2019, and September 2021, and that those reports were all for substantial risk of harm. An indicated report is "any report of child abuse or neglect made to [DCFS] for which it is determined, after an investigation, that credible evidence of the alleged abuse or neglect exists." 89 Ill. Adm. Code 300.20; see also 325 ILCS 5/3 (West 2022). K.H. had been referred twice for intact services as a result of these indicated reports.

¶ 15    During Mathena's phone conversation with K.H. on May 31, 2022, K.H. told Mathena that she and J.H. lived with T.H.  Mathena told K.H. that she and J.H. should not return to the residence given the sexual abuse allegations against T.H.  Later that day, K.H. called Mathena and told her that she was going to the residence to retrieve clothing and expressed understanding for why she and J.H. should not reside there with T.H.  At that point, K.H. believed T.H. to be J.H.'s father.

¶ 16    During one of Mathena's conversations with K.H. on May 31, 2022, K.H. expressed concern that T.H. would not be able to celebrate J.H.'s second birthday.  K.H. felt that his presence was important because T.H. had been incarcerated for most of J.H.'s life.  Mathena felt that K.H. needed to "shift her priorities."

¶ 17    Mathena and K.H. discussed an appropriate safety plan, and K.H. agreed to temporarily move to a safe place, a family member's residence. Mathena met K.H. at that residence later that day. K.H. informed Mathena that she was in a romantic relationship with T.H., and he had been

violent with her in the past. K.H. stated, "maybe I trigger him." Mathena and K.H. discussed services that DCFS had previously recommended for K.H. in relation to her other children. DCFS had recommended "mental health services" in the past, but K.H. had not completed those services because DCFS closed the case.

¶ 18    Mathena spoke with K.H. over the phone again on June 2, 2022. K.H. questioned why she and J.H. were involved in the current investigation. K.H. said D. had "gotten into trouble," and K.H. believed D. was using the allegations to "deflect" from that trouble. Mathena informed K.H. that T.H. was facing a criminal investigation based on D.'s allegations, and it was not safe for J.H. to remain in the home with T.H. Mathena testified that K.H. believed D. was falsely reporting the sex abuse allegations against T.H..

¶ 19    On June 7, 2022, Mathena met with K.H. at the safe residence, and K.H. informed Mathena that T.H. was willing to move out of their previously shared residence.  K.H. stated that she wanted to return to that residence. Mathena did not approve of K.H.'s move because K.H. "had not been consistent in her account. She had not been honest. At that point, we were questioning whether she had the capacity to fully understand the scope of the allegations and wouldn't be able to protect [J.H.] if she were to return to the [old] address."

¶ 20    Mathena met with K.H. again on June 7, 2022.  K.H. called T.H. in Mathena's presence, and Mathena described T.H.'s tone as "incredibly hostile" and "aggressive."  Later that same day, Mathena spoke with K.H. over the phone and K.H. again expressed concerns regarding her involvement in the investigation. Mathena explained to her that DCFS assesses every household member for potential risk, and also considers the prior history of a case and compliance with services. During that phone conversation, Mathena heard T.H.'s voice in the background.  The

safety plan did not prevent K.H. from taking J.H. to the residence she shared with T.H..

¶ 21    During the three-week investigation, Mathena spoke to K.H. almost daily, and K.H. asked about seven times to alter the safety plan. Mathena testified K.H. had not "vetted some of the suggested safety plan participants." It was not the intent for J.H. to be repeatedly moved. Mathena offered K.H. intact services but K.H. declined. K.H. believed that she had "nothing to do" with D.'s allegations of sexual abuse against T.H..

¶ 22    On June 9, 2022, Mathena took protective custody of J.H. on the basis that K.H. "had already at least five prior indicated reports. We were not able to demonstrate that she is taking any corrective action. [K.H.] had declined intact family services. We had also offered safety where she could remain with [J.H.], and [K.H.] disrupted that plan and was not able to coordinate an alternative plan for [J.H.]." Mathena believed that K.H. did not understand why T.H. was a risk to J.H. T.H. was indicated by DCFS as the perpetrator of sexual abuse of D., and K.H. was also indicated by DCFS for substantial risk of injury for the current investigation. K.H. had also indicated that she was still living with T.H. J.H. was living elsewhere.

¶ 23    On cross examination Mathena testified that she had no knowledge of K.H. allowing J.H. to remain in the residence with T.H. She also stated that between May 31 and June 7, 2022, J.H. never showed signs of abuse or neglect.

¶ 24    The trial court found J.H. abused and neglected due to an injurious environment and due to substantial risk of physical injury, pursuant to sections 2-3(1)(b) and 2-3(2)(ii) of the JCA. 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2022). The court found:

> "that the State has met its burden of proof by a preponderance of the evidence that [J.H.]

was abused or neglected under both neglect injurious environment and abuse substantial risk of injury.

The reason for this is the testimony of Investigator Mathena. I find that her testimony was knowledgeable and credible. She outlined the investigation and the attempts made to avoid taking [J.H.] into custody. The reason this case first came in is because of the outcry by [D.] And I reviewed the victim sensitive interview that was marked as People's Exhibit No. 4. I do find that her testimony or her statements in the interview are credible. They are detailed. They are above her age limit of what she should know about sexual activities, and they were -- she outlined a history of abuse by her father, [T.H.], from the time she believes she was about three, and it was on multiple occasions, and it was oral sex primarily, and other sexual abuse that went on for a while, and it included testimony about grooming behavior by [T.H.] and the fact that it started when she was very young and went on for years is of particular concern in these circumstances. So that is how the case initially came in. But then Investigator Mathena testified that she looked at the historical information and saw five prior indicated reports by [K.H.] in 2015, '16, '18, '19, and then 2021 I believe, and that the mom had been referred for intact services, and that she had other minors that were not in her custody.

So the mother lived with putative father, [T.H.], who is the father of [D.] and then thought to be the father of [J.H.], but so [K.H.] lived in the same home with [T.H.] and with [J.H.], who at the time was almost two years old, not quite two years old.

The investigator advised mom that she should not return home and should come up with the safety plan. And if the mother had done so and had broken off her relationship

and her involvement with the putative father, [T.H.], then this would be a different case, but that's not what happened. The mother hemmed and hawed. She was asked to do a safety plan. She did not break off her relationship with the putative father. At one point she said she was heading to the home with [J.H.], the home where she lived with the putative father, [T.H.], and she didn't go there only because Investigator Mathena told her that she should not return to that home. At some point, the mother did, in fact, return to the home because Investigator Mathena heard the father speaking in the background, [T.H.], and that was on June 9th. And I should say that the mother belittled and didn't take seriously the allegations of the minor, [D.]. She basically said that the minor made it up because she was in trouble and was trying to deflect the responsibility to something else.

And additionally, there is a history of domestic violence between the putative father [T.H.] and [K.H.], and she admitted that to the investigator. She confirmed that she was in a romantic relationship with him, and her statement that maybe I triggered him also -- maybe I trigger him also is a lack of understanding about how victims should not really blame themselves and be blamed for domestic violence that happens in a relationship, and I'm also relying on the records that were admitted, and in particular, among other things, the publication packet from the Mount Sinai Hospital records for the mom, which is People's Exhibit No. 1A, in which mother had went to the hospital because she was involved in a domestic violence incident with the putative father [T.H.]. And in particular, Exhibit 1A, Pages 7 through 10, and on Page 10, the mother – it's noted that the mother was abused physically, abused by Putative Father [T.H.] while she was

9

pregnant with [J.H.], and she also had some untreated mental health issues. And so given all of that, the DCFS made the decision to take [J.H.] into custody, and they were justified in doing so.

I do recognize that the statements of a minor as to abuse or neglect, if uncorroborated, shall not be sufficient in themselves to support a finding of abuse or neglect. But that's not what we have here. There is more than just [D.'s] credible statements about the sexual abuse by Putative Father [T.H.]. I disagree with Mr. Pick that I cannot find her credible. There is nothing in the statute that prevents me from making a credibility finding, even a credibility finding of the statements of the minor alone. And we are not just relying on those statements in reaching the conclusions today."

¶ 25    The trial court immediately proceeded to the dispositional hearing.  The court admitted several of the State's exhibits including a September 2022 DCFS clinical integrated assessment, a December 2022 client service plan, a May 2023 court report, a January 2023 DCFS note stating K.H. failed to appear for a drug test and a January 2023 DCFS report known as an "IM+CANS," or Illinois Medicaid Comprehensive Assessment of Needs and Strengths.

¶ 26    The September 2022 DCFS clinical integrated assessment involved review of pertinent DCFS and other records, as well as an interview with K.H. The aim of the assessment is to obtain a social history and determine the family's service needs in the context of the parent's parenting strengths and weaknesses. K.H. had a history of DCFS involvement in her own childhood and had "repeatedly came to the attention of DCFS between 2015 and 2022."  K.H. did not believe T.H. sexually abused his daughter, D., and had no concerns about T.H.'s parenting. In September 2021, J.H. was hospitalized for several days, and K.H. visited her

intoxicated and smelling of marijuana.

¶ 27    The clinical screener's impressions notes that K.H. had a difficult childhood and had experienced disruption and stress as an adult. K.H. "engaged in multiple long-term domestically violent relationships" and said she would maintain a relationship with T.H., despite believing that he might harm or kill her.  K.H. did not understand how domestic violence affected her children, and it was unlikely she could parent her children safely.  The prognosis for reunification was poor. The assessor recommended that K.H. obtain a parenting capacity assessment, a psychological evaluation, trauma-based individual therapy, a substance abuse assessment, and parenting education. At the time of the assessment, T.H. was incarcerated. J.H. was also evaluated, and the assessor noted she had experienced significant stress in her life, but it appeared she "benefited from regular and appropriate care of her foster parent," and was developmentally on target.

¶ 28    The May 10, 2023, court report indicated that K.H. had attended individual therapy, but inconsistently, and did not seem willing to discuss the reasons for her DCFS involvement. K.H.'s therapy ended when her therapist left the agency. K.H. had a substance abuse assessment and was recommended for outpatient services, but she was removed from that program after inconsistent attendance and persistently using her phone in the group. She tested positive for THC, a common cannabinoid found in cannabis.  K.H. was not visiting J.H. consistently.

¶ 29    Ashley Robinson, the assigned caseworker from Lutheran Child and Family Services, testified for the State. J.H.'s placement was safe and appropriate.  J.H. had been hospitalized in March 2023, for a seizure, which she had a history of.  She did not need treatment but needed to follow up with a neurologist.

¶ 30    K.H. currently has supervised visitation with J.H., one visit per week for two hours. The last visit took place on February 8, 2023. K.H. missed visits because the foster family was unavailable for two weeks. When J.H. was in the hospital, K.H. did not confirm in time that she would visit.  There has been no contact between K.H. and J.H. since February 8, 2023.  Before February 8, K.H. would visit about once a month.  Robinson supervised the last visit, and it went well. K.H. "was very engaging. She did come with toys and food for [J.H.]. She has clothes as well for [J.H.] also." K.H. had been given bus cards and gas cards for transportation. K.H. had not contacted Robinson since March 29, 2023, when Robinson notified K.H. about J.H. being in the hospital. Robinson had tried to contact K.H., but her number was disconnected.

¶ 31    K.H. had completed a substance abuse assessment for her marijuana use and had been recommended to complete intensive outpatient drug treatment, but K.H. had not completed the program.  K.H. had not been referred for a parenting capacity evaluation or psychological evaluation, because she needed to be sober for six months before starting services. K.H. had also been referred to a nurturing parenting program but had not engaged in that service. K.H. had been recommended for child-parent psychotherapy with J.H., but a referral had not been made because K.H. would need to first "fully engage" in individual therapy, and she was not currently engaged.

¶ 32    K.H. testified on her own behalf.  She testified that she completed a parenting class and had not been able to visit J.H. much due to work.

¶ 33    The trial court found K.H. unable to parent J.H., made J.H. a ward of the court, and placed her in the guardianship of DCFS as it was "in the best interest of the minor and the public."  The court found that the mother was "unable for reasons other than financial

circumstances alone to care for, protect, train, or discipline the minor." The unknown father was found unable and unwilling. "Reasonable efforts have been made to prevent or eliminate the need for removal of the minor from the home," and "[a]ppropriate services aimed at family preservation and family reunification have been unsuccessful." The court also entered a permanency goal of return home within 12 months, finding that K.H. had made "some progress" toward return home. This appeal followed.

¶ 34                                    ANALYSIS

¶ 35    K.H.'s sole argument on appeal is that the trial court's findings at the adjudication hearing, that J.H. was neglected due to an injurious environment, and abused due to a substantial risk of injury, are against the manifest weight of the evidence. K.H. is not appealing the court's findings following the dispositional hearing. The Public Guardian and the State argue that the court's adjudicatory findings are not contrary to the manifest weight of the evidence where K.H. refused to acknowledge the risk to J.H. posed by her paramour, T.H., the domestic violence in the home created an injurious environment, and K.H.'s belief that J.H.'s sibling's sex abuse allegations were false created an injurious environment for J.H.

¶ 36    At an adjudicatory hearing, the circuit court must determine whether the minor is abused, neglected, or dependent before conducting a dispositional hearing on wardship. 705 ILCS 405/2-21 (West 2020); 705 ILCS 405/2-18(1) (West 2020); *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). The court must consider the status of the minors at the time the adjudication petition was filed and not their status at the time of the hearing. *In re C.W.*, 199 Ill. 2d 198, 217 (2002); *In re Kenneth D.*, 364 Ill. App. 3d 797, 804 (2006).

¶ 37    It is the burden of the State to prove allegations of neglect and abuse by a preponderance

of the evidence. *In re Arthur H.*, 212 Ill. 2d at 463. The trial court has broad discretion when determining the existence of neglect or abuse as it has the best opportunity to observe the demeanor and conduct of the parties and witnesses and is therefore in the best position to determine the credibility and weight to be given to the witnesses' testimony. *In re Stephen K.*, 373 Ill. App. 3d 7, 20 (2007). We review a trial court's finding of abuse and neglect under the manifest weight of the evidence standard. *In re Alexis H.*, 401 Ill. App. 3d 543, 551 (2010). "A finding is against the manifest weight of the evidence only if the opposite result is clearly evident." *In re A. W.*, 231 Ill. 2d at 254. Where multiple allegations of unfitness are made, a finding that any one allegation has been proved obviates the need to review other statutory grounds. *In re J.J.*, 307 Ill. App. 3d 71, 76 (1999).

¶ 38    Here, K.H. argues that she complied with the DCFS safety plan when she moved to a new residence after T.H.'s daughter, D., accused him of sexually abusing her. She further argues that she did not allow J.H. to have contact with T.H. She also argues there is no evidence that J.H. was exposed to domestic violence between her and T.H.

¶ 39    Section 2-3(1)(b) of the Act states that a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2020); *In re Arthur H.*, 212 Ill. 2d at 462. "The term 'injurious environment' is a broad and amorphous concept that cannot be defined specifically, but it includes the breach of a parent's duty to ensure a safe and nurturing shelter for the children." *Id.* A court may find neglect regardless of whether there was a willful or unintentional disregard of parental duty. *In re K.T.*, 361 Ill. App. 3d 187, 200 (2005). An "abused minor" includes any minor under 18 years old whose parent intentionally creates a substantial risk of physical injury which would be likely

14

to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function. 705 ILCS 405/2-3(2)(ii) (West 2020). The same facts and evidence that support a finding of neglect due to injurious environment may also support a finding of abuse due to substantial risk of injury. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 44. "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d at 463.

¶ 40    The court's finding that J.H. was neglected because of an injurious environment and abused due to a substantial risk of injury is supported by the evidence and is not against the manifest weight of the evidence.  The court based its ruling on the history of domestic violence between K.H. and T.H., noting K.H.'s lack of understanding of domestic violence.  The court also based its decision on D.'s allegations of sexual abuse by T.H., and despite the allegations, the fact that K.H. and J.H. were living with T.H. and K.H. did not "break off her relationship" with T.H.  The court further found that K.H. did not take D.'s allegations seriously because she believed D. was falsely reporting the allegations to deflect from getting in trouble.  Finally, the court also noted the five-prior indicated DCFS reports and K.H.'s untreated mental health issues.

¶ 41    While there was no evidence in this case that J.H. suffered any physical or sexual abuse, the allegations against K.H. in this case have a basis in the theory of anticipatory neglect, whereby the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside with an individual who has been found to have neglected or abused another child. *In re Arthur H.*, 212 Ill. 2d at 468.  While there is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household (*In re S.R.*, 349 Ill. App. 3d 1017,

15

1021 (2004)), section 2-18(3) of the Act (705 ILCS 405/2-18(3) (West 2012)) provides that the proof of neglect of one minor "shall be admissible evidence" on the issue of the neglect of any other minor for whom the parent is responsible (*In re S.R.*, 349 Ill. App. 3d at 1021). Each case must be reviewed according to its own facts. *In re Arthur H.*, 212 Ill. 2d at 468-69.

¶ 42    The evidence at the adjudication hearing established that K.H. was the victim of domestic violence at the hands of T.H. and that the most recent instance of medically documented domestic violence occurred as recently as September 2021 when K.H. was seen at the emergency room for abdominal pain suffered as a result of being punched in the stomach by her boyfriend. Previous instances of domestic violence were also documented:  In January 2019 K.H. was treated at Mt. Sinai Hospital for groin and hip pain, after T.H. "kicked her." In November 2019, K.H. was treated at Mt. Sinai after being punched in the face multiple times by T.H.. In March 2021, K.H. had a "human bite" on her leg, of unspecified origin.  K.H. herself admitted that she was the victim of domestic violence at the hands of T.H., believing that she may "trigger" him.

¶ 43    Although K.H. did initially follow the safety plan and take J.H. to safe housing, K.H. eventually returned to the residence that she shared with T.H.  As Mathena testified, the safely plan was not binding and there was nothing that could prevent K.H. from taking J.H. back to the residence she shared with T.H. at any time.  Evidence of domestic violence in the household firmly supports a finding that the minors are at a substantial risk of injury, which includes both physical injury and impairment of emotional health. See 705 ILCS 405/2-3(2)(ii) (West 2020). Importantly, courts "need not wait until a child becomes a victim of physical abuse or permanent emotional damage before such a finding may be upheld." *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 39.

16

¶ 44    In addition, there was credible evidence that T.H., K.H.'s paramour, had sexually abused his daughter D., while living in the same household as J.H.  There is no question that K.H. was aware of D's allegations against T.H., even if she was not privy to the specifics as she claims. The finding of sexual abuse against D. was ultimately indicated by DCFS.

¶ 45    Mathena questioned whether K.H. "had the capacity to fully understand the scope of the allegations," and whether she had the desire or the ability to protect J.H. from T.H., especially because K.H. believed D. was falsely reporting the allegations. K.H.'s belief that D. was falsely reporting the allegations created an injurious environment for J.H., because K.H. had no real motivation to continue with the safety plan and stay away from T.H., whom, at the time, she believed to be J.H.'s father. D.'s allegations were serious and K.H.'s dismissal of the allegations as false placed J.H. at risk.  A parent's refusal to believe allegations of sexual abuse supports a finding of abuse and neglect.  *In re An.W.,* 2014 IL App (3rd) 130526, ¶ 65 (Finding of abuse and neglect upheld when mother was aware of children's allegations that father had sexually abused them and did not believe the allegations allowing father back in the home); see also *In re Z.R.*, 274 Ill. App. 3d 422 (1995).

¶ 46    Certainly, by remaining in a romantic relationship and continuing to live with T.H., K.H. was subjecting J.H. to abuse and neglect as a result of T.H.'s prior physically and sexually abusive behavior towards K.H. and his daughter, D.  Our courts have repeatedly emphasized that the statutory provisions, which we outlined earlier, require simply "an injurious environment or substantial risk of harm" in order to sufficiently support a finding of neglect or abuse and, once this has been found, the trial court need not wait until the child becomes a victim or is permanently emotionally damaged to remove her, regardless of what has occurred with a sibling.

*In re Jordyn L*, 2016 IL App (1st) 150956, ¶ 35; *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995).

¶ 47     Here, there was sufficient evidence to establish that J.H.'s environment was injurious and that there was a substantial risk of physical injury.  As such, the trial court's findings that J.H. was neglected due to an injurious environment to his or her welfare and abused based on a substantial risk of physical injury were not against the manifest weight of the evidence.

¶ 48                                            CONCLUSION

¶ 49     The judgment is affirmed.

¶ 50     Affirmed.